**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DIANNE BOND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 04-0457-WS-D** |
| | ) | |
| **MONROE COUNTY BOARD OF** | ) | |
| **EDUCATION,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on defendants' Motion for Summary Judgment (doc. 31). The Motion has been briefed and is ripe for disposition at this time.[1] Also pending is defendants' Motion to Strike (doc. 50) portions of plaintiff's brief in opposition to the Rule 56 Motion.

**I.     Background.**

    *A.     Nature of the Action.*

Plaintiff Dianne Bond brought this action against the Monroe County Board of Education (the "Board") and a dozen individual defendants (including five Board members, the Superintendent of Education for the Board, four school principals employed by the Board, and two administrative employees of the Board) pursuant to 42 U.S.C. §§ 1983 and 1988. Bond maintains that defendants abridged her federal constitutional rights to family privacy and to association by denying her numerous applications seeking employment as a teacher in the Monroe County public school system "because the Plaintiff's children were enrolled in a private school." (Complaint, ¶ 12.) Alternatively, Bond asserts

---

[1] In a separate pleading styled Plaintiff's Request for Oral Argument (doc. 42), plaintiff has requested oral argument on the Motion. After careful review of the materials submitted, and all parts of the court file deemed relevant, the Court is of the opinion that oral argument would not be of material assistance in resolving the Motion. As such, the Request for Oral Argument is **denied**. *See* Local Rule 7.3 (providing that "the court may in its discretion rule on any motion without oral argument").

that defendants violated her constitutional right to association by denying her employment because she "was not affiliated with the political patronage circles of the various principals and administrative supervisors" at schools to which she applied.  (*Id.*, ¶ 22.)  Based on these allegations, Bond seeks damages, injunctive relief to place her "in the highest teaching position for which she is objectively qualified" (*id.* at 10), and an award of interest, costs and attorneys' fees.

### B.    Pertinent Facts.[2]

#### 1.    Plaintiff's Teaching Experience and Qualifications.

Because this action centers on Bond's suitability (or lack thereof) for employment by the Board, her qualifications are of no small significance.  The record reflects that Bond is a seasoned educator with nearly 20 years of teaching experience in Alabama public school systems.  In particular, from 1985 to 1991, Bond taught pre-kindergarten, kindergarten, and third grade for the Selma City Board of Education.  (Bond Aff., at Exh. A.)  From 1991 to 2000, Bond was a kindergarten teacher with the Alexander City Board of Education.  (*Id.*)  She gained tenure in both the Selma and the Alexander City systems.  (*Id.*, ¶ 2.)  Between 2001 and 2002, Bond served as a homebound teacher and substitute teacher for the Monroe County Board of Education, during which time she, among other things, filled in while another teacher was taking maternity leave and substituted in several schools where she later submitted job applications.  (Bond Dep., at 16-17.)[3]  And from 2002 through the

---

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir.  2004); *Johnson v. Governor of State of Fla.*, 353 F.3d 1287, 1292 (11th Cir. 2003) (on summary judgment, "the district court must view all evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in its favor").  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

[3]    Defendants include amidst their exhibits the complete 211-page transcript of plaintiff's deposition, as well as the complete deposition transcripts for a number of other witnesses.  In so doing, defendants run afoul of Local Rule 5.5(c), which provides that "If discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response."  *Id.*  By attaching such extraneous documents, counsel would oblige the Court to wade through hundreds of pages of superfluous materials in search of any portions of the exhibits that may be relevant to the Motion.  This practice is inappropriate.  *See generally Witbeck v. Embry Riddle*

present, she has worked for the Conecuh County Board of Education teaching kindergarten and pre-kindergarten, and serving as a reading coach (effective July 2005).  (*Id.* at 11-12.)  Plaintiff's evaluations in the Conecuh County system have been excellent.  (Bond Aff., ¶ 8 & Exh. A.)  Bond has never been involuntarily terminated from any teaching position.  (*Id.*, at Exh. A.)

In addition to her extensive teaching experience, Bond boasts strong academic credentials.  She has multiple post-secondary degrees, including a B.S. in Early Childhood from Auburn University, an M.A. and an Ed.S. in the same field from Auburn University at Montgomery ("AUM"), and an M.A. in Supervision and Administration from AUM.  (Bond Aff., ¶ 2.)  Effective June 2004, the Alabama Department of Education designated her a Highly Qualified Teacher ("HQT") in the subjects of early childhood education (pre-K through third grade) and reading (pre-K through twelfth grade).  (Plaintiff's Exh. 1.)[4]  Bond holds a "AA" Alabama teaching certificate in Early Childhood and a "A" certificate in

_____

*Aeronautical University, Inc.*, 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions regarding whether genuine issues remain for trial."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (federal courts "are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it"); *Nicholas Acoustics & Specialty Co. v. H & M Const. Co.*, 695 F.2d 839, 846-47 (5th Cir. 1983) ("practical constraints on the time of a judge make it impossible for the judge to examine a record of even moderate size with such finitude as to be both exhaustive and exhausting").  On various occasions, both sides appear to invite the Court to study the entire sprawling record spanning thousands of pages to glean unspecified, uncited evidence in support of a proposition articulated in conclusory, general terms.  In light of the foregoing principles, the Court declines to scour the voluminous summary judgment record *sua sponte* for uncited evidence that might bolster the parties' respective positions.

[4]      Plaintiff's Exhibit 1 is a letter from the Alabama Department of Education confirming that she has been certified an "HQT" in these areas.  This exhibit, like many others submitted by the parties for summary judgment purposes, lacks authentication or verification.  Generally, courts ruling on Rule 56 motions may consider only admissible evidence.  *See Denney v. City of Albany,* 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form.") (citation omitted).  Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that they can be reduced to admissible, authenticated form at trial.  *Bozeman v. Orum*, 199 F. Supp.2d 1216, 1222 (M.D. Ala. 2002).  Those requirements were not followed as to this exhibit.  Nonetheless, there appears to be no dispute that "Plaintiff's Exhibit 1" is in fact a true and

Administration.  (*Id.*)[5]

In June 2000, plaintiff's husband received a work-related transfer, prompting the family to move from Tallapoosa County to Monroe County.  (Bond Aff., ¶ 3.)  When the Bonds arrived in Monroe County, they had two young children, ages 3 and 5.  (Defendants' Exh. 2.)  The Bonds elected to enroll their children in a private school, Monroe Academy.  (Bond Aff., at Exh. A.)  There is no dispute that, at all times material hereto, plaintiff's children have been enrolled in Monroe Academy.

2.       *Plaintiff's Applications for Employment from 2000-2004.*

Between June 2000 and 2004, Bond applied for and was interviewed for approximately 21 vacant instructional positions in the Monroe County public school system.  (Bond Dep., at 67-68; Bond Aff., ¶ 7.)  She did not receive a single job offer.  (*Id.*)[6]  Prior to plaintiff's relocation to Monroeville, her mother-in-law, Evelyn Bond, inquired of a Board member, defendant Patricia Black, about the possibility of Bond teaching for the Board.  (Evelyn Bond Aff., ¶ 3.)  In response, Black indicated twice that "you have to understand that it is a total package deal."  (*Id.*)  Black declined Bond's mother-in-law's requests for elaboration of this comment; however, the latter construed it as meaning that the Board would not hire Bond unless her children went to public school (*i.e.*, that Bond's children were the "package," without which no "deal" was possible).  (*Id.*)[7]

_____

accurate copy of the letter; as such, it is apparent that this document can be reduced to admissible, authenticated form at trial, and the Court will consider it on that basis.  The same rationale applies to other unverified, unauthenticated exhibits in the record.

[5]       The record does not explain the significance of an "AA" or "A" certificate, as compared to those held by other applicants for the challenged positions.  Therefore, the Court can draw no inferences as to the desirability of such a designation.

[6]       Defendants present unrebutted evidence that Bond did not apply for every vacancy in the Monroe County system for which she might have been qualified.  This evidence is accepted for summary judgment purposes; nonetheless, its probative value is negligible.  The fact remains that Bond applied and was rejected for numerous positions for which she was qualified over a four-year period.

[7]       Despite defendants' vast evidentiary submission in support of their Rule 56 Motion, they offer no affidavit from defendant Black either denying this statement or offering any other interpretation of its meaning.

-4-

### a. The Monroeville Elementary Interview of June 2000.

In June 2000, Bond participated in her first job interview in Monroe County when she met with the Monroeville Elementary School principal, defendant Melanie Ryals, concerning an available teaching position.[8] (Bond Dep., at 48-49; Bond Aff., ¶ 4.)  During the interview, Ryals stated that she had checked the school's rolls and had determined that Bond's children were not enrolled at that school.  (*Id.*; Bond Dep., at 50.)  When Ryals asked plaintiff point blank where her children attend school, plaintiff acknowledged that her one school-aged child was enrolled at Monroe Academy and asked if that was a problem.  (*Id.*)  Ryals responded that "it was a factor" in the hiring process that Bond's child was enrolled at Monroe Academy, inasmuch as it would cause "a parent problem" for Ryals in dealing with parents of Monroeville Elementary schoolchildren who might resent Bond's decision.  (*Id.* at 50-54.)  According to Bond, Ryals told her that parents at Monroeville Elementary "would not a want a parent that's got their children at MA, but yet you're going to teach them in a public school."  (*Id.* at 53.)[9]  During this same interview, Ryals also told Bond that the Board did not have a policy of refusing to hire teachers whose children attended Monroe Academy.  (*Id.* at 51.)  Bond was not hired for the job at Monroeville Elementary, either on this occasion or in connection with her two subsequent job interviews and nine subsequent applications from 2001-2004.  (*Id.* at 55.)[10]

---

[8]     The Court has reviewed the record in vain for an indication of the nature of the vacancy at Monroeville Elementary for which Bond was applying in June 2000.  Ryals testified that she did not even remember if there was a vacancy in the summer of 2000.  (Ryals Dep., at 71-75.)  Bond testified that she "believed" it was a kindergarten position, but she appeared uncertain.  (Bond Dep., at 63-64.)

[9]     Ryals' apprehension in this regard was apparently not unfounded.  An undated newspaper article (incorrectly identified in defendants' brief as "Exhibit 23") relates an incident during a Board meeting in which a "concerned parent" stated that public school teachers "hurt the credibility of the system by sending their children to private and Christian schools" and that they "are sending a bad message about our schools."  (Defendants' Exh. 20.)  According to the article, the person making such comments to the Board "received a supportive 'Amen' from an unidentified person" in the audience. (*Id.*)

[10]    During a 2001-2002 interview, Ryals reiterated to Bond that there was no Board policy against hiring parents of Monroe Academy children, but that "it is still a factor" in the hiring decision because of the potential for "conflict" with parents.  (Bond Dep., at 56-57.)  Defendants

-5-

Following her June 2000 interview at Monroeville Elementary, Bond reported Ryals' "factor" statements to the Superintendent, defendant Dennis Mixon.  (Bond Aff., ¶ 6; Bond Dep., at 60.)  Upon hearing Bond's account of Ryals' remarks about having children at Monroe Academy, Mixon replied, "she didn't say that" and advised Bond "to go and find a principal that likes you."  (*Id.* at 61.)  Bond had a "similar conversation" with a Board administrative employee, defendant Jennifer Philen, who likewise advised Bond to find a principal who liked her, but cautioned her against seeking employment from defendants Ryals or Payne given the anti-Monroe Academy sentiment in the communities served by their schools.  (Bond Aff., ¶ 6.)

> b.    *Plaintiff's Interviews with other Board Representatives.*

In the course of her 21 applications to the Board between June 2000 and 2004, Bond was not required to complete a new written application each time; rather, the record reflects that she prepared only two written applications, the first being dated June 2000 and the second dated April 2004.  (Defendants' Exh. 2, 3.)  Curiously, the Board's preprinted application form includes an "optional" question stating, "If you have children in school, list the schools they attend."  (*Id.*)[11]  In her June 2000

_____

challenge this evidence by pointing to their Exhibit 19, a 41-minute recording of this interview. Defendants provide neither a transcript nor any citation to a particular passage of this recording on which they rely.  It is not the Court's responsibility to sift through an entire 41-minute interview in search of some shred of evidence that might bolster defendants' position.

[11]    Aside from the portion of the Board's employment application form relating to the school affiliation of applicants' children, the Court observes that many questions posed on the application appear problematic, if not downright dangerous, from a liability standpoint.  Among other things, the Board's form asks applicants to disclose their race, date of birth, gender, height, weight, marital status, religious affiliation, health and disability status, and number and ages of children, and informs them that their application will not be processed without a photograph.  (Defendants' Exh. 2, 3; Plaintiff's Exh. 16.)  Such queries conflict with enlightened human resources practices and could create exposure for the Board in the equal employment opportunity arena.  *See, e.g., EEOC Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations* (Oct. 10, 1995) (explaining that at the pre-offer stage, an employer cannot ask questions that are likely to elicit information about a disability); *EEOC Statement on Preemployment Inquiries* ("[T]he Commission's responsibility to promote equal employment opportunity compels it to regard such inquiries with extreme disfavor ... [A]n applicant's race, religion and the like are totally irrelevant to his or her ability or qualifications as a prospective employee, and no useful purpose is served by eliciting such

application, Bond left that question blank; however, in her April 2004 iteration she answered the question by responding that her children attend Monroe Academy.  (*Id.*)[12]  Defendants have never identified a legitimate reason for their desire to know where a teaching applicant's children attend school; indeed, Mixon acknowledged in his deposition that he is unaware of why the Board would need this information antecedent to a hiring decision.  (Mixon Dep., at 33-35.)

Plaintiff apparently has not furnished a comprehensive inventory of the teaching positions as to which she is claiming that her civil rights were violated.  Nonetheless, defendants have proffered evidence that, aside from the multiple positions at Monroeville Elementary School for which she interviewed with Ryals or Ryals' designee, as mentioned *supra*, Bond applied for the following jobs in the Monroe County school system during the 2000-2004 period: (i) a kindergarten teaching position at Frisco City Elementary School in 2000; (ii) a kindergarten teaching position at Excel School in 2002; (iii) two third-grade teaching positions at Monroeville Middle School in 2002; (iv) a fifth-grade teaching position at Excel School in June 2003; (v) a kindergarten teaching position at Excel School in June 2003; (vi) an Alabama Reading First Initiative reader coordinator position in April 2003; (vii) a second-

---

information.").  Such ill-chosen questions may be deemed persuasive evidence of employment discrimination; however, the mere asking of such a question, without more, does not constitute actionable discrimination *per se*.  *See, e.g., Armstrong v. Turner Industries, Inc.*, 141 F.3d 554, 561 (5th Cir. 1998) ("This Court has been unable to find any indication either in the text of the ADA or in its legislative history that a violation of the prohibition against preemployment medical examinations and inquiries, in and of itself, was intended to give rise to damages liability."); 29 C.F.R. § 1625.5 (asking for date of birth on application is not, in itself, a violation of the ADEA, but any such request "will be closely scrutinized to assure that the request is for a permissible purpose"); 29 C.F.R. § 1604.7 (request for employee to identify gender on application is permissible only if made in good faith and for a nondiscriminatory purpose).  The Court highly doubts that the expedient of merely dubbing certain of those questions "optional" dissipates their taint.  As such, the Board would be well advised to reconsider the format and contents of its employment application form.

[12]      Another curious difference in the two applications is that plaintiff's 2000 application recited her educational attainment to a much greater extent than her 2004 application.  (*Compare* Defendants' Exh. 2 *with* Defendants' Exh. 3.)  In fact, the latter mentions only Bond's high school diploma.  Although neither side has highlighted this discrepancy, it seems unusual that a prospective teacher seeking employment would omit reference to several teaching-related advanced degrees on her application form.

grade teaching position at Frisco City High School in May 2004; and (viii) a third-grade teacher position at Monroeville Middle School in May 2004. (Hicks Aff., ¶ 2.)[13]

The record does not identify the frequency of plaintiff's job interviews for the nearly two dozen positions for which she applied. However, it is apparent that at various times plaintiff interviewed with defendants Ryals, Darenell Payne (principal of Monroeville Middle School), John Ross (principal of Excel School), William Royster (principal of Frisco City Elementary School), Jennifer Philen (instructional supervisor) and Marion Hines (an administrative employee) for vacant positions. There is no evidence that any of these individuals (other than defendants Ryals and Philen, as discussed previously) ever asked where plaintiff's children attended school, discussed any Board policies or practices with regard to hiring teachers whose children attended private school, or indicated in any way that Bond's decision to send her children to Monroe Academy would be considered adversely in the hiring process. (Bond Dep., at 73, 91, 104, 111-12.)[14] Additionally, while plaintiff hypothesizes that

_____

[13]     In addition to these nine delineated vacancies at schools other than Monroeville Elementary School, Bond applied for the following positions at Monroeville Elementary: (i) a first-grade teaching position in July 2002; (ii) a kindergarten teaching position in June 2002; (iii) a first-grade teaching position in June 2002; (iv) a pre-K-4 teaching position in 2002; (v) a part-time pre-K-4 teaching position in June 2003; (vi) two kindergarten teaching positions in June 2003; (vii) two reading coach positions in April 2003; (viii) two first-grade teaching positions in May 2004; and (ix) a kindergarten teaching position in May 2004. (Hicks Aff., ¶ 2.) Thus, Board records show that between 2000 and 2004, plaintiff applied for 12 positions at Monroeville Elementary, and 9 positions at other schools. Of course, these records omit the position for which Bond applied at Monroeville Elementary in June 2000 when she first interviewed with Ryals, so defendants' list is incomplete. Also, given plaintiff's testimony that Monroeville Elementary interviewed her just three times, it is unclear which of the dozen or more positions for which she applied were associated with those interviews. In any event, as principal of Monroeville Elementary, Ryals made the decision not to recommend Bond to be hired for any of the vacancies at Monroe Elementary for which she applied (except for the reading coach positions, which involved different recommenders). (Ryals Aff., ¶¶ 6-11.)

[14]     In that regard, defendants Payne and Royster have testified that they were unaware of Bond's educational choices for her children when they rejected her applications. (Payne Aff., ¶ 9; Royster Aff., ¶ 9.) Plaintiff's sole response is that she sent Payne her April 2004 application, which answered the "where do your children attend school" question by stating that they attend Monroe Academy. Thus, although plaintiff has not shown a genuine issue of material fact that Payne and Royster knew her children went to private school prior to April 2004, there certainly are unresolved

any one of those principals "could have" checked the rolls to see if Bond's children were enrolled in public school (Plaintiff's Brief, at 8-9), she has not developed evidence that they did so.[15]   At the end of the interviewing process, other applicants were selected for each and every Monroe County teaching position for which Bond applied during a four-year period.[16]

_____

questions as to whether Payne possessed such knowledge after April 2004.  Royster retired in 2003; therefore, he would not have received plaintiff's 2004 application and was not involved in any employment decisions relating to that application.  (Royster Aff., ¶ 3.)

[15]     For example, plaintiff's counsel deposed each of the defendant principals.  During those depositions, plaintiff's counsel could have asked whether they checked the rolls to see whether Bond's children were enrolled in public school.  Having never asked the question despite a fair opportunity to do so, plaintiff cannot rely on speculation that some fact "could" be true when she has failed to ascertain whether it is or is not.  *See, e.g., Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("unsupported speculation ... does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.").

[16]     The parties have displayed a distressing disregard for the privacy interests of other applicants.  Indeed, plaintiff offers as summary judgment exhibits the complete application packets of some 18 other candidates.  (Plaintiff's Exhs. 8-12, 15-27.)  These unredacted documents contain a treasure trove of sensitive personal information about the applicants, including dates of birth, social security numbers, addresses, employment history, family data, and the like.  These exhibits are a cyber-thief's paradise.  It is astounding that (a) defense counsel would produce such documents to plaintiff in discovery without redacting the sensitive information, and (b) plaintiff's counsel would file such exhibits electronically in unredacted form, thereby effectively broadcasting personal identifying information about innocent third parties to anyone with a computer.

This District Court's Administrative Procedure for Filing, Signing and Verifying Documents by Electronic Means places the burden for redactions squarely on the parties and counsel, as it clearly states that "[i]t is the sole responsibility of counsel and the parties to ensure that redaction of personal identifiers is done."  (*Id.* at 13.)  This procedure is consistent with the E-Government Act of 2002, Pub.L. No. 107-347, 116 Stat. 2899 (Dec. 17, 2002).  Nonetheless, the Court cannot sit idly by as privacy interests of third parties are trampled by the carelessness of defense counsel in producing such unredacted documents and of plaintiff's counsel in filing them as-is.  Accordingly, it is hereby **ordered** that Plaintiff's Exhibits 8 - 12, and 15 - 27 are **stricken**.  The Clerk's Office is directed to permanently **delete** those exhibits from the CM/ECF system.  Plaintiff's counsel is **ordered** to submit redacted versions of those exhibits, accompanied by an appropriate Notice of Filing, on or before **October 14, 2005**.  That said, the Court will consider plaintiff's exhibits in their current form for summary judgment purposes, so there is no need to delay entry of this Order pending receipt of the redacted materials.

In the spring of 2004, Bond became concerned that her employment in the Conecuh County public school system might be non-renewed because of a possible school closing and her non-tenured status. (Bond Aff., ¶ 9.) At that time, Bond sent a letter to defendant Mixon, with copies to all defendant Board members and all defendant principals. (*Id.*) The letter explained her circumstances in Conecuh County, and enclosed Bond's renewed application for employment, which specifically answered the question regarding her children's school of enrollment. (*Id.* at ¶ 14 & Exh. A.) The Board received enthusiastic recommendations for Bond from the principals of the two Conecuh County schools where she had worked. The first reference touted her as "a very effective and dedicated teacher," who "has been a professional at all times," and whose "students have done extremely well." (*Id.*) The second reference lauded Bond's performance, indicating that she "did an excellent job with the kindergarten class .... Good teacher!!" (*Id.*) Notwithstanding Bond's letter, her renewed application, and her favorable job references, defendants did not hire her for any vacant positions in the spring 2004.[17]

> 3.   *The Board's Policies and Its History of Employing Teachers with Children in Private Schools.*
>
> a.   *Board Hiring Procedures.*

The Board's stated policies tout it as an equal opportunity employer, and defendants insist that the Board does not discriminate on the basis of where job applicants' children attend school. (Mixon Aff., ¶ 4.)[18] When a vacancy opens in the Monroe County system, it is posted in accordance with state law. (Mixon Dep., at 86.) The principal at the school where the vacancy exists interviews candidates and makes a hiring recommendation to Mixon. (Mixon Aff., ¶ 5.) Mixon then interviews the recommended candidate and decides whether to recommend that candidate to the Board. (*Id.*) Once

---

[17]    Ultimately, Bond secured continuing employment in the Conecuh County school system as a first grade teacher and reading coach for the 2004-2005 school year. (Bond Dep., at 12-13.) In the present school year, Bond is working in Conecuh County as a reading coach for Lyeffion School, the same school where she had been for the previous two years. (*Id.* at 11-12.)

[18]    Such a self-serving statement must be regarded with caution. After all, the Board's policy statements are not necessarily dispositive of anything, if their actual practices conflict with those stated policies.

-10-

Mixon recommends a candidate to the Board, the Board makes the final hiring decision.  (*Id.*)[19]  In his six years as acting or permanent Superintendent, Mixon has never rejected a teacher recommendation made by any principal.  (Mixon Dep., at 29.)  During that same interval, the Board has never overturned any hiring recommendations made by Mixon, nor has it "seriously questioned" any of those recommendations.  (*Id.* at 52-53.)

A critical point is that once a principal elects <u>not</u> to recommend a particular candidate, that decision is <u>never</u> reviewed by the Superintendent or by the Board.  Thus, neither the Board nor Mixon ever had occasion to review or consider Bond's candidacy for any of the 21 positions for which she applied in the 2000-2004 period.  Because the principals did not recommend her, and because neither the Superintendent nor the Board undertakes any review or consideration of non-recommended applications, much less a comparison of the relative strengths and qualifications of recommended and non-recommended applicants, Bond was effectively disqualified and her application was effectively a dead letter the instant that a principal decided not to recommend her.  In that regard, the following passage from Mixon's deposition is illuminating:

"Q:     And you do not say, okay, Mr. Principal, send me the other applications, I want to secondguess you?
"A:     I do not secondguess principals.
"Q:     And second guessing – not second guessing, you do not review the other applicant's –
"A:     No, sir.
"Q:     – applications that have not been recommended?
"A:     No, sir."

(Mixon Dep., at 49-50.)  Likewise, Mixon never re-interviews candidates whom principals have decided not to recommend.  (*Id.* at 28.)

     *b. The Board's Hiring Record.*

In an effort to demonstrate their benevolence toward parents of children in private school, defendants have compiled a list of 46 teachers whom the Board has employed at some time during the

---

[19]     This procedure accords with Alabama law, which provides that "[t]he county board of education shall appoint, upon the written recommendation of the county superintendent, all principals, teachers, clerical and professional assistants authorized by the board."  Ala. Code § 16-8-23.

-11-

last ten years and whose children attend or attended private schools.  (Hicks Aff., ¶ 3 & Exh. V.)[20]

Fully 30 of the 46 teachers on defendants' list sent their children to Monroe Academy, just as plaintiff

did.  Of course, this chart is of questionable utility without evidence that (a) some of these teachers

were hired (given that hiring – not promotions or voluntary transfers – is the type of personnel action at

issue here) after their children began attending private school; (b) the same principals who rejected

Bond's employment applications recommended the hiring of these teachers; (c) at the time they made

the recommendation decisions, those principals knew that those teachers' children attended private

school; and (d) such hiring activity occurred during or near the time period relevant to this case.  To that

effect, the data that would be most helpful would be evidence of the number of teachers recommended

for hire by each of defendants Ryals, Payne, Ross, Royster and Philen between 2000 and 2004 who (i)

had enrolled their children in Monroe Academy or other private school before applying for the position;

and (ii) were known by the principal to have made such enrollment decision at the time the hiring

recommendation was made.  This data is not available in the record.

   Indeed, the evidentiary value of the 46-teacher list is substantially diminished by an affidavit

submitted by defendants in connection with their earlier, withdrawn summary judgment motion, which

indicates that only 14 of the 46 listed employees were "hired, promoted or granted leave or transferred

at their request <u>while</u> their children attended private schools."  (Hicks Aff. of 5/9/05 (doc. 17, Exh. 1),

¶ 3.)[21]  Thus, 32 of the 46 employees received advantageous employment action when their children

---

   [20]  Defendants boast that these 46 teachers constitute approximately 15% of its
professional certified workforce, which is 350 persons strong.  (Reply Brief, at 15 n.7.)  This statistic is
misleading.  Defendants do not maintain that 46 teachers <u>currently</u> employed by the Board have
children in private schools.  Instead, defendants state that this number refers to "46 of its employees in
the last ten years."  (<i>Id.</i> at 15.)  As such, the proper denominator for an apples-to-apples comparison is
not the 350 members of the Board's professional workforce today, but is rather the cumulative number
of professional employees that the Board has employed throughout the last ten years, which may
substantially exceed 350 persons.  Through this empirical fallacy, defendants exaggerate the significance
of their 46 employees with children in private schools as a fraction of the relevant Board workforce.

   [21]  Hicks' previous affidavit from May 2005 is quite similar to the July 2005 affidavit
submitted in connection with the present Rule 56 Motion.  Given the obvious significance of the
information about the subset of the 46 employees who received favorable employment action while

were not attending private schools.  It is difficult to imagine how those 32 employees are somehow evidence of defendants' goodwill and non-discrimination towards teachers whose children attend private school.  Of the remaining 14 employees, the Court cannot discern how many were <u>hired</u> (as opposed to being promoted or transferred) while their children were attending private school.  Of that number, the Court cannot ascertain how many were recommended for hire by a defendant principal or administrator in this case.[22]  Of that number, the Court cannot tell how many were <u>known</u> by the applicable decisionmaker(s) to have children enrolled in private school when the defendant principal made the hiring recommendation.

      Simply put, defendants' 46-employee list is largely unhelpful.  The Court cannot find on this incomplete record that <u>any</u> of those 46 employees is similarly situated to Bond.  Nearly seven in ten of these individuals received advantageous treatment at a time when their children were not enrolled in private school.  Of the remaining three in ten, there remains no basis for analogizing their circumstances to Bond's.  Defendants could have very different attitudes towards hiring parents of children who attend private school, as compared to promoting or transferring such individuals who are already existing Board employees; unfortunately, defendants' list does not distinguish between these divergent circumstances.  Likewise, if a defendant principal recommended a person on the list for hiring without

_____

their children attended private school, it is perplexing that defendants would omit that sentence from the second iteration of Hicks' affidavit.  Perhaps the answer lies in Hicks' deposition transcript, wherein she candidly acknowledged that she was "not sure" how the list of 46 had been winnowed down to 14, indicated that such a list had been prepared "in a very hurried manner," and conceded that no effort had been made to verify this information with the teachers themselves.  (Hicks Dep., at 9, 11-12.)  Apparently, then, defendants have little confidence in the accuracy of their "14" figure, suggesting that it is speculative as to how many (if any) of the 46 were hired while their children were attending private school.  Of course, mere speculation is not a substitute for proper investigation of the facts, and unquestionably does not get the job done on summary judgment.  *See Cordoba v. Dillard's, Inc.*, 419 F.3d at 1181 ("unsupported speculation ... does not meet a party's burden of producing some defense to a summary judgment motion").

      [22]      At most, defendants proffer evidence that perhaps 21 of the 46 employees received some favorable personnel action after Mixon became acting Superintendent in 1999.  (Mixon Dep., at 53-72.)  But Mixon's involvement says nothing about the identity of the persons at the school level who made these personnel recommendations.

knowledge that the person's child attended private school, that person's hire is mere happenstance and cannot evince a policy of nondiscrimination against applicants whose children attend private school. And if non-parties were making hiring recommendations as to those individuals, or if the recommendations were made remote in time from Bond's applications, at a time when different policies or practices may have been in place, then those "comparables" are not similarly situated to Bond at all. The record leaves a winding trail of question marks in each of these areas, all of which combine to render the 46-person list of low probative value in assessing the attitudes of defendants toward applicants whose children were known to attend private school at the time of the application.

That said, there is some evidence (uncited in defendants' briefs) that individual defendants made hiring recommendations of teachers despite actual knowledge that their children attend private school. Defendant Payne testified that he has recommended two teachers (Violet DeWitt and Angela Carter) for hire with knowledge that their children were attending Monroe Academy.  (Payne Aff., ¶ 10.)  But Payne has been principal of Monroeville Middle School for 17 years (*id.*, ¶ 3), and there is no indication as to the temporal boundaries of these decisions.  That Payne may not have discriminated against Monroe Academy parents in the late 1980s is not persuasive evidence that he did not discriminate against Bond on that basis in the early 2000s.  The same rationale applies to defendant Ross, who states that he has recommended four Monroe Academy parents for hire at unidentified time periods during his 21-year stint as principal of Excel School.  (Ross Aff., ¶¶ 2, 7.)  Likewise, defendant Royster maintains that he knowingly recommended one private school parent for hire at an unspecified time during his 20-year tenure as principal of Frisco City Elementary School.  (Royster Aff., ¶ 8.)

## II.     Motion to Strike.

Before evaluating the merits of the Motion for Summary Judgment, the Court is constrained to consider defendants' Motion to Strike, which may shape the record on summary judgment.  This Motion consists of 14 numbered paragraphs in which defendants object to a variety of arguments and representations made by Bond in opposition to the Rule 56 Motion.  These objections may be grouped into the following categories: (1) objections to plaintiff's arguments as being conclusory or speculative, (2) objections to plaintiff's attempts to tarnish the credibility of defense witnesses, (3) objections to

hearsay and gossip, and (4) objections to emotional injury testimony.

A.      *Objections to Arguments of Counsel.*

The majority of the Motion to Strike consists of defendants' requests that various contentions by plaintiff's counsel be stricken.  For example, defendants take umbrage at plaintiff's counsel's arguments in his brief that Bond is "unemployable" in Monroe County, that the persons hired were "obviously less well qualified," that Ryals informed Bond that her children's school enrollment "would be a factor" in Ryals' hiring recommendation, that defendants engaged in an "organized personal rejection" of Bond, and the like.  (*See* Motion to Strike, at ¶¶ 1, 2, 3, 5, 6, 7, 8, 9, 12.)

Evidently, defendants seek to strike these statements because they disagree with them.  That is not a proper legal basis for a Motion to Strike.[23]  Plaintiff's counsel is entitled to make arguments in his brief, and to argue reasonable inferences from the summary judgment evidence. If defendants dispute

_____

[23]      As a general proposition, material from a summary judgment submission may be stricken in four circumstances.  First, this remedy may be appropriate where material is "redundant, immaterial, impertinent or scandalous," pursuant to Rule 12(f), Fed.R.Civ.P.  Striking matter on Rule 12(f) grounds is a drastic, disfavored remedy.  *See, e.g., Sierra Club v. Tri-State Generation and Transmission Ass'n, Inc.*, 173 F.R.D. 275, 285 (D. Colo. 1997) ("Allegations will not be stricken as immaterial under this rule unless they have no possible bearing on the controversy."); *Judicial Watch, Inc. v. U.S. Dept. of Commerce*, 224 F.R.D. 261, 263 (D.D.C. 2004) (matter is "scandalous for the purposes of Rule 12(f) when it ... unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court"); *Poston v. American President Lines, Ltd.*, 452 F. Supp. 568, 570 (S.D. Fla. 1978) ("Motions to strike on the grounds of insufficiency, immateriality, irrelevancy and redundancy are not favored").  Second, an affidavit may be stricken as a sham when it directly contradicts, without explanation, a witness's previous sworn testimony.  *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony").  Third, an affidavit may be stricken when it runs afoul of Rule 56(e), Fed.R.Civ.P., which requires that summary judgment affidavits be "made on personal knowledge," that they "set forth facts as would be admissible in evidence," and that they "show affirmatively that the affiant is competent to testify to the matters set forth therein."  *Id.*  Fourth, the Court may strike an affidavit or brief as a sanction for noncompliance with court orders, violations of applicable rules, or certain other misconduct.  *See, e.g., Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) ("Courts have the inherent authority to control the proceedings before them, which includes the authority to impose "reasonable and appropriate" sanctions.").  None of these circumstances are present here.

the legitimacy or veracity of those arguments or the factual or logical predicate upon which such arguments rest, their remedy is to persuade the Court that plaintiff is wrong, not to file a motion seeking to blot the offending arguments from the record.  The Court will not strike a portion of the plaintiff's brief simply because an argument expressed therein may suffer from a logical or factual defect.[24]  The Motion to Strike is therefore **denied** as to Paragraphs 1, 2, 3, 5, 6, 7, 8, 9 and 12.

> **B.      Objections to Plaintiff's Attacks on Defense Witness Credibility.**

In Paragraph 10 of the Motion to Strike, defendants object to plaintiff's "inappropriate challenges to various defendants' credibility as witnesses and the truthfulness of their sworn testimony." (Motion to Strike, ¶ 10.)  Plaintiff's brief takes issue with certain specific aspects of the testimony of defendants Ryals, Ross, Payne, Royster and Philen, and offers an affidavit from Bond to dispute the particulars of their testimony.  For example, Ross testified that Bond was late to interviews, but Bond denies that she was ever late.  Such argument is hardly "inappropriate."  It is a nonmovant's prerogative – and, indeed, is often her entire objective – on summary judgment to offer evidence and argument tending to cast doubt on the credibility of the movant's evidence.  Defendants' position would handcuff a nonmovant from interjecting credibility disputes or otherwise exposing genuine issues of material fact in contesting a Rule 56 motion.  Such a contention veers perilously close to frivolity.

> **C.      Objections to Hearsay and "Community Gossip".**

In Paragraphs 4 and 11, defendants seek to strike information set forth in the affidavits of Bond and her mother-in-law, Evelyn Bond.

Evelyn Bond's affidavit includes the following challenged facts: (a) she spoke to several people in Monroe County about teaching prospects for plaintiff; (b) Jeanette Adams, a volunteer at a local school, told affiant that Bond could not be employed if her children attended Monroe Academy; (c)

---

[24]      If the Court were to entertain motions to strike in such circumstances, precious few summary judgment briefs (including those submitted by defendants in this case) would likely emerge unscathed and unredacted.  The Court's reaction to defendants' position is encapsulated in the famous aphorism, "I disapprove of what you say, but I will defend to the death your right to say it."  Surely neither Voltaire nor any seasoned trial attorney would quarrel with the proposition that a litigant should not be silenced simply because his arguments are incorrect, misguided or unpersuasive.

-16-

defendant Black told affiant twice that "it is a total package deal" if plaintiff wished to teach in public

school; and (d) affiant's interpretation of Black's remark was that plaintiff needed to enroll her children

in public school if she wanted a job.  (Evelyn Bond Aff., ¶ 3.)  There is no valid objection to item (a),

which is neither hearsay nor speculation.  As for item (b), the Court agrees that Evelyn Bond's

testimony as to what Adams said about Adams' perception of Board hiring practices is inadmissible

hearsay and lacks foundation, so this testimony will be excluded.[25]  After all, in the Eleventh Circuit,

"[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary

judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation omitted).

Accordingly, the clause in Evelyn Bond's affidavit addressing her conversation with Adams is **stricken**.

Item (c) is obviously admissible as the admission of a party opponent pursuant to Rule 801(d)(2),

Fed.R.Evid.  Defendants' argument to the contrary is baseless.  Finally, as to item (d), the Court will

allow Evelyn Bond to testify as to her reasonable interpretation of defendant Black's statements to her,

subject to defendants' right (of which they have not availed themselves to date) to present testimony by

Black offering a contrary interpretation.

　　　　With regard to Bond's affidavit, the Court's summary judgment ruling does not depend in any

way on plaintiff's beliefs concerning the alleged anti-integration, racially-charged reasons for Monroe

Academy's founding and the relative stigma attached to that school vis a vis other private schools.  As

---

[25]　　　　Plaintiff maintains that Evelyn Bond's testimony about what Adams told her is admissible under Rule 803(21), Fed.R.Evid., because it goes to the Board's reputation for retaliating against parents of Monroe Academy children.  Although Rule 803(21) renders nonhearsay testimony about the "[r]eputation of a person's character among associates or in the community," the statement attributed by Evelyn Bond to Adams speaks to Adams' opinion of whether the Board would hire plaintiff.  It did not purport to comment on the reputation of the Board's character in the relevant community.  Also, plaintiff has made no showing that character evidence would even be admissible in this case pursuant to Rule 404, Fed.R.Evid.  This matter is best reserved for more detailed briefing in a motion in limine.  For now, however, the Court will exclude Evelyn Bond's statement relating to Adams, inasmuch as (i) plaintiff has not shown why character evidence is admissible here; (ii) plaintiff has not shown how Adams' statement lies within the ambit of Rule 803(21); (iii) there is insufficient foundation showing Adams' personal knowledge; and (iv) any prejudice to plaintiff of excluding this testimony is negligible given the vanishingly low probative value of an elementary school volunteer's naked opinion about Bond's chances of being hired by the Board.

such, it is unnecessary for the Court to assess the admissibility of plaintiff's interpretations of community sentiment on that issue. This topic is appropriately addressed, if at all, in the context of a motion in limine. The Motion to Strike is **moot** as to Paragraph 11.

>    **D.    *Objections to Emotional Injury Testimony.***

Finally, defendants seek to strike the affidavit of Dr. Angela Powell concerning plaintiff's medical diagnosis, as well as the portion of Evelyn Bond's affidavit addressing plaintiff's emotional state.

Defendants protest that Dr. Powell's affidavit "fails to demonstrate any scientific, technical or specialized knowledge to qualify as expert testimony," much less to prove that she is "qualified to render any expert opinion concerning the plaintiff's alleged injury or the cause thereof." (Motion to Strike, ¶ 13.) These objections are absurd. The affidavit reflects that Dr. Powell is a licensed, practicing physician who earned her M.D. from the University of Alabama at Birmingham and completed a residency in the Tuscaloosa Family Practice Residency Program in 1997. The affidavit further reflects that Dr. Powell was Bond's treating physician. Given this evidence, it is difficult to comprehend defendants' decision to attack Dr. Powell as lacking specialized knowledge and unqualified to render expert opinions concerning plaintiff's medical diagnosis. Likewise, defendants' objection to Dr. Powell presenting plaintiff's statements made to her for purposes of diagnosis or treatment is squarely foreclosed by Rule 803(4), Fed.R.Evid. If defendants truly believe Dr. Powell is unqualified, their remedy is to file a *Daubert* motion, properly supported by evidence and authority. For now, however, their Motion to Strike is **denied** as to Dr. Powell's affidavit.

Finally, defendants seek to strike the portion of Evelyn Bond's affidavit as "lay witness testimony as to the cause of plaintiff's alleged emotional injury." (Motion to Strike, ¶ 14.) Certainly, Evelyn Bond is competent to testify as to her observations of plaintiff's mood and demeanor, and how plaintiff's years of rejection by defendants appear to have affected her mood and demeanor. Defendants' characterization of this testimony as an improper attempt to use a lay witness to offer expert testimony as to plaintiff's medical diagnosis is inaccurate. The Court also disagrees with defendants' assertion that Evelyn Bond's affidavit must be stricken because it improperly "embraces an

ultimate issue to be decided by the Court." (*Id.*)  That the affidavit bears on issues to be decided by the Court does not render it inadmissible.  *See* Rule 704(a) (setting forth general rule that "testimony in the form of an opinion or inference otherwise admissible is ***not objectionable because it embraces an ultimate issue to be decided by the trier of fact***") (emphasis added).

> ### E.    Conclusion.

In sum, then, the Motion to Strike is **denied** in all respects, except that it is **granted** as to the portion of Evelyn Bond's testimony concerning statements made by Jeanette Adams.[26]

## III.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and

---

[26]    The overwhelming majority of defendants' objections articulated in their ill-advised 13-page Motion to Strike (which was nearly half as long as their principal Rule 56 brief)  are meritless on their face.  Counsel are strongly encouraged to exercise restraint in filing such a Motion, which has imposed a significant burden on this Court and on opposing counsel.  Indeed, this filing distracted the Court's time, attention and resources away from the merits of the Rule 56 Motion by obliging it to rule on more than a dozen specific detailed objections, most of which are plainly not viable grounds for striking plaintiff's materials.  A Motion to Strike serves a very limited function.  It certainly is not a knee-jerk platform for counsel to voice *ad hoc* complaints about every aspect of plaintiff's brief with which it disagrees, or to replicate or refine counterarguments presented in a reply brief.  For the sake of efficient utilization of scarce judicial and litigant resources, and to avoid possible adverse repercussions to their own interests, defendants would be well advised before filing a Motion to Strike to assess, at a minimum, whether they have a reasonable, good-faith basis for objecting, and whether striking the offending material is a legally attainable remedy for those objections.

making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).   However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  *Id.* at 1086 (citation omitted).

## IV.    Analysis.

As grounds for their Motion, defendants advance three principal arguments.  In logical order, these contentions are as follows: (i) plaintiff has failed to present substantial evidence that her employment applications were rejected because of where her children attend school; (ii) even if she had made such a showing, plaintiff's claims against the Board still fail because she has no substantial evidence of a Board policy or custom; and (iii) plaintiff's claims against the individual defendants fail because they lacked hiring authority, their actions were protected by qualified immunity, the official-capacity claims mirror those against the Board, and the claims against certain individual defendants lack the requisite particularity.[27]

---

[27]    In defendants' 28-page principal brief and their 15-page reply brief in support of their Motion for Summary Judgment, they have focused exclusively on the private school issue raised in Count One.  They have not addressed whether there is any evidence to support Count Two, in which plaintiff alleges that she was denied employment because she "was not affiliated with the political patronage circles of the various principals and administrative supervisors" (Complaint, ¶ 22), whatever that may mean.  At its core, this case appears to be about private schools, not "political patronage circles," and the Court is unaware of any record evidence that plaintiff's rejection had anything to do with "political patronage circles."  Nonetheless, as defendants elected not to make any Count Two-specific arguments in their Rule 56 filings, the Court cannot assess globally the viability of that cause of action at this time.

### A.      Governing Legal Standard.

As an initial matter, the parties disagree as to the appropriate legal standard for reviewing plaintiff's claims.  Defendants urge the Court to adopt the time-honored *McDonnell Douglas* circumstantial proof framework that applies under Title VII and similar provisions where an employer is alleged to have taken adverse employment action based on a prohibited factor (*e.g.*, race, age, gender, religion, etc.).  By contrast, plaintiff insists that this case is not parallel to Title VII because it "involves the deprivation of a constitutionally protected right," and that the burden-shifting analysis should instead be drawn from the *Mt. Healthy* model applied in Free Speech cases.  (Plaintiff's Brief, at 27.)  Based on its review of applicable precedent in circumstances akin to those present here, the Court is of the opinion that neither side has correctly articulated the standard of proof (inasmuch as neither has cited binding free association cases), but that there is a kernel of truth to each party's position.

To prevail on a theory of employment discrimination for exercise of one's First Amendment right to free association, a plaintiff "must demonstrate that she had a constitutional right and that she suffered adverse employment action for exercising the right."  *Chesser v. Sparks*, 248 F.3d 1117, 1124 (11th Cir. 2001); *see also McCabe v. Sharrett*, 12 F.3d 1558, 1562 (11th Cir. 1994) ("In order for a public employee to establish that an employer conditioned his or her job in a way that burdened impermissibly a constitutional right, the employee must first demonstrate that the asserted right is protected by the Constitution and that he or she suffered 'adverse employment action' for exercising the right.").  "'Adverse employment action' is broadly defined and as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands."  *Id.* at 1563.

Under *Chesser / McCabe*, then, plaintiff bears the burden of establishing that she suffered adverse employment action for exercising her right to free association.  The question then becomes how she can use circumstantial evidence to satisfy that burden for purposes of a Rule 56 motion.  In the Court's view, the *McDonnell Douglas* burden-shifting analysis is uniquely suited to allocate the parties' respective burdens in this procedural posture.[28]  In the failure to hire context, a plaintiff's *prima facie*

---

[28]      In that regard, Section 1983 claims alleging discrimination in employment and relying on circumstantial evidence are commonly analyzed in accordance with *McDonnell Douglas*.  *See Jackson*

case requires a showing that: (1) plaintiff is a member of a protected class (*i.e.*, that she exercised her First Amendment right of free association); (2) she applied and was qualified for a position for which the employer was accepting applications; (3) despite her qualifications, plaintiff was not hired; and (4) after plaintiff's rejection, the position remained open or was filled by a person outside the protected class (*i.e.*, one who did not exercise her associational right as plaintiff did).  *See EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265 (11th Cir. 2002); *Schoenfeld v. Babbitt*, 168 F.3d 1257 (11th Cir. 1999).  The "qualified" requirement refers to basic qualifications for a job rather than optimal performance.  *See Richey v. City of Lilburn*, 127 F. Supp.2d 1250, 1259 (N.D. Ga. 1999); *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769 (11th Cir. 2005) (explaining that plaintiff need only show that she satisfied objective qualifications because "prima facie case is designed to include only evidence that is objectively verifiable and either easily obtainable or within the plaintiff's possession").[29]

If the plaintiff successfully establishes a *prima facie* case, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for [not hiring plaintiff]. ... If the employer does so, the burden shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997) (citations omitted).  A plaintiff may establish pretext "either directly, by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly, by persuading the court that the proffered reason for the employment decision is not worthy of belief."  *Hall v. Alabama Ass'n of School Boards*, 326 F.3d 1157, 1166 (11th Cir. 2003); *see also Wilson*,

---

*v. State of Alabama State Tenure Com'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (applying *McDonnell Douglas* to § 1983 claims of race discrimination in termination of teaching contract); *Hall v. Alabama Ass'n of School Boards*, 326 F.3d 1157, 1165-66 (11th Cir. 2003) (similar).  The gravamen of Bond's claims is that defendants discriminated against her because of where her children go to school.  As such, the analogy between plaintiff's claims and the more run-of-the-mine employment discrimination claims for which *McDonnell Douglas* was tailored seems quite persuasive.

[29]     Any suggestion that plaintiff must prove as part of her *prima facie* case that the successful applicants were equally or less qualified than she is foreclosed by the Eleventh Circuit's reasoning in *Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998).

376 F.3d at 1088 (plaintiff may prevail "by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination"). The ultimate burden of persuasion remains with the plaintiff. *See Joe's Stone Crabs*, 296 F.3d at 1273.[30]  It is through this lens that defendants' summary judgment motion will be evaluated.[31]

### B. Plaintiff Has a Constitutionally Protected Right to Send her Children to Private School.

Under *Chesser* and *McCabe*, plaintiff must first demonstrate that she had a cognizable

---

[30]  Plaintiff objects that defendants should bear the burden of persuasion pursuant to *Mt. Healthy* and that applying *McDonnell Douglas* effectively lets defendants off the hook. (Plaintiff's Brief, at 27.) The Court disagrees. Even under the *Mt. Healthy* line of authority championed by plaintiff, she would bear responsibility for showing that her constitutionally protected activity "played a substantial part" in the decision not to hire her. *Jackson*, 405 F.3d at 1282. The *McDonnell Douglas* framework assists the Court and the parties in explaining how the parties' respective circumstantial evidence on the "played a substantial part" question should be evaluated. If plaintiff has presented enough evidence to reach a jury on that issue, then and only then does an argument by defendants that they would not have hired her even if she sent her children to public school come to the fore. In effect, defendants would be proffering a mixed-motive defense as to which they would bear the burden of persuasion under either a Free Speech or a Title VII analysis. *See generally Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (opining that mixed-motive defense may apply in cases of circumstantial proof, where employer demonstrates that it would have taken the same action in the absence of the impermissible motivating factor). The Court need not decide here whether the *Desert Palace* burden on employers seeking to invoke the mixed-motive defense is the same as that on employers seeking refuge in the *Mt. Healthy* affirmative defense, nor need it define whether the parameters of those defenses are coextensive in the degree of protection furnished (*i.e.*, whether they are "complete" or "partial" affirmative defenses).

[31]  Even if the *McDonnell Douglas* standard did not apply, there can be no reasonable dispute that causation is a necessary element of Bond's § 1983 claims. Without evidence of causation, her claims cannot survive summary judgment review. *See, e.g., Dixon v. Burke County, Ga.*, 303 F.3d 1271, 1274-75 (11th Cir. 2002) (explaining that mechanical structure of § 1983 is similar to common law of torts and that without evidence of causal link between alleged harm and alleged unlawful conduct, plaintiff's § 1983 case fails as a matter of law). Thus, under any reasonable proof framework, it would remain Bond's burden to show that defendants failed and refused to hire her <u>because</u> of her exercise of her right to send her children to private school.

-23-

constitutional right.  As indicated *supra*, Count One of the Complaint alleges that Bond's decision to enroll her children in private school was protected by her right to association, as guaranteed by the First and Fourteenth Amendments, as well as by her constitutionally protected right to privacy.  (Complaint, ¶ 18.)  The Complaint further alleges that defendants' refusal to hire her because of that enrollment decision deprived her of those constitutional rights and is actionable under § 1983.  (*Id.*)

Although defendants vigorously dispute Bond's theory of why she was not hired, they do not quarrel with her assertion that her right to send her children to private school is one of constitutional dimensions.  Indeed, the facts alleged by Bond, if proven, would undoubtedly establish a First Amendment violation actionable under § 1983.  In *Stough v. Crenshaw County Bd. of Educ.*, 744 F.2d 1479 (11th Cir. 1984), the court addressed a school board patronage policy prohibiting board employees from sending their children to private schools.  After finding that "[t]here is no question in this case that the board's policy interferes with the plaintiffs' exercise of their constitutional right to control the education of their children," the *Stough* panel balanced the plaintiffs' rights as parents against the board's interests in overseeing the school system.  *Id.* at 1480.  The board sought to justify its policy as promoting harmonious work relationships (inasmuch as teachers resented colleagues whose children went to private school), suppressing a negative message to public school students (*i.e.*, the message that public school was not "good enough" for the teacher's children), ensuring favorable board-teacher relationships, and promoting integration of public schools.  The *Stough* court found insufficient evidence to support any of these justifications, and therefore affirmed the district court's ruling that the patronage policy impermissibly infringed on the teachers' constitutional rights and could not be sustained by the board's legitimate interests.  *Id.* at 1482.[32]

_____

[32]       Other jurisdictions considering similar patronage policies have reached similar conclusions.  *See Barrett v. Steubenville City Schools*, 388 F.3d 967, 973 (6th Cir. 2004) (opining that a teacher's choice in directing his son's education by sending him to private school "is activity shielded by his constitutionally protected right of liberty"); *Barrow v. Greenville Independent School Dist.*, 332 F.3d 844, 848 (5th Cir. 2003) ("public-school employees like Barrow have a protected right to educate their children in private school," which right cannot be abridged by board unless employee's exercise of it materially affects state's educational mission).  In light of *Stough*, the Court cannot agree with defendants' position that "the Eleventh Circuit has not addressed the issue of whether the plaintiff's

Ordinarily, in ascertaining whether a plaintiff's freedom of association rights have been violated, the Eleventh Circuit applies the *Pickering* balancing test. *See Cook v. Gwinnett County School Dist.*, 414 F.3d 1313, 1320 (11th Cir. 2005). "*Pickering* requires the district court to balance the interest of the public employee in exercising his right of free speech or association against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ross v. Clayton County, Ga.*, 173 F.3d 1305, 1310 (11th Cir. 1999) (citations omitted). Here, however, defendants have expressed no justification for why a patronage policy might promote the efficiency of the public services performed by the Board. Defendants' position is that there was no patronage policy in place. In so framing their defense, without offering arguments in the alternative, defendants waive their opportunity to assert that even if the personnel decisions in question were patronage-based, they proceeded from legitimate operational and administrative concerns that outweigh Bond's associational interest for purposes of a *Pickering*-style analysis. Defendants not having suggested that there were valid reasons why Bond might have been excluded for having children in private school, the Court will not endeavor to conjure such reasons *sua sponte*.

On the evidence and arguments before the Court, a *Pickering* balancing analysis establishes that Bond had a constitutionally protected right to send her children to private school, and that her interest in so doing was not outweighed by any countervailing interest by defendants in ensuring efficient operations of Monroe County public schools.

### C.     There Is Substantial Evidence that Defendants Denied Plaintiff Employment Because of Her Children's School Affiliation.

Plaintiff having demonstrated the requisite constitutional right, the remaining question under *Chesser* and *McCabe* is whether defendants rejected her employment applications because of her exercise of that right. To assess this element of plaintiff's case and apply the *McDonnell Douglas* test

---

right to send her children to private school outweighs any alleged interest of a school district in refraining from hiring persons whose children attend private schools." (Reply Brief, at 5.) Besides, defendants have never articulated any legitimate reason for refusing to hire all teachers whose children attend private schools. On this record, the Court must conclude that Bond's undisputed constitutional interest in having her children attend private school outweighs any unstated, unidentified reasons the Board might have in preventing her from doing so.

most efficiently, the Court will subdivide plaintiff's 21 unsuccessful job applications into seven distinct categories.

>    1.    *Non-Reading Coach Applications at Monroeville Elementary.*

As stated *supra*, Bond applied for at least twelve (12) teaching positions – including two pre-K-4 positions, four kindergarten positions, four first grade positions, and two reading coach positions – at Monroeville Elementary School between 2000 and May 2004.  For all positions other than the reading coach jobs, hiring recommendations were made by defendant Melanie Ryals, the principal of Monroeville Elementary.  The Court will first examine the ten positions for which Ryals made recommendations.[33]

Defendants do not challenge plaintiff's ability to establish a *prima facie* case under *McDonnell Douglas* for any of the Monroeville Elementary teaching posts.  Nor could they.  The record plainly establishes that plaintiff is a member of a protected class (*i.e.*, that she exercised her First Amendment right of free association), that she applied and was qualified for each of the ten posted vacancies,[34] that she was not hired, and that each position remained open and was ultimately filled by an applicant outside the protected class (*i.e.*, one who did not send her children to private school).

Bond having shown a *prima facie* case of wrongful exclusion for exercising her constitutional rights, the burden shifts to defendants to establish a legitimate nondiscriminatory reason for the challenged decisions.  Without addressing each of the ten hiring decisions in detail, the Court will

---

[33]    The reading coach positions will be left for consideration in subsection 2, *infra*, because the identities of the persons recommending hires for those positions differed from those for the other Monroeville Elementary positions.

[34]    Defendants equivocate on the qualification prong by stating that "plaintiff may have possessed the minimal qualifications for some of the jobs for which she applied."  (Defendants' Brief, at 21; *see also* Reply Brief, at 12-13.)  Such hesitance to concede an obvious point is misplaced.  Defendants cannot seriously contend that, after accumulating four post-secondary degrees and well over a dozen years of experience teaching pre-kindergarten, kindergarten and third grade in Alabama public school systems, and garnering favorable recommendations from her employers, Bond was unqualified to teach pre-K-4, kindergarten or first grade in Monroe County.  Far from promoting defendants' cause, such obstinate refusal to concede serves only to clutter the analysis, squandering the Court's time in locking down ancillary matters that cannot reasonably be contested.

assume that defendants have satisfied their burden of production.[35]

Plaintiff has come forward with substantial evidence that, if believed by a jury, would tend to show that Ryals' proffered reasons for not selecting Bond are unworthy of belief and that Ryals' decisions to reject Bond's applications were more than likely motivated by an unlawful reason (namely, Bond's exercise of her right to educate her children in private school).  Viewed in the light most favorable to plaintiff, the record shows the following occurrences: (i) the first time Ryals ever interviewed Bond in June 2000 she told Bond that she had checked the school's rolls and had determined that Bond's children were not enrolled there; (ii) Ryals proceeded to ask Bond point blank during the interview where her children went to school; (iii) when Bond responded truthfully, Ryals explained that Bond's schooling choice would be "a factor" in her hiring decision because Bond's choice could cause trouble for Ryals in dealing with Monroeville Elementary parents.[36]  A jury that believed plaintiff's evidence on this point could reasonably conclude that Ryals rejected Bond's applications not because she preferred the interviewing style of other applicants and not because other applicants had been student-teachers at Monroeville Elementary, but because Bond was sending her own children to private school.[37]  This is sufficient evidence of pretext to defeat defendants' Motion for

---

[35]    For example, defendants proffered evidence that Ryals recommended certain applicants because they had previously been teachers, student teachers or aides at Monroeville Elementary or at other schools in the Monroe County system or because Ryals was "impressed with the way [the successful applicant] conducted herself during the interview." (Ryals Aff., ¶¶ 6-11.). Plaintiff has not disputed the sufficiency of defendants' articulation of a legitimate nondiscriminatory explanation for each of these hiring decisions, at least for purposes of satisfying defendants' burden of production.

[36]    The Court recognizes that Ryals both denies Bond's account of the conversation, and insists that she specifically stated that the enrollment of Bond's children would not be a factor in Ryals' decision. (Ryals Aff., ¶ 12.) Such evidence is unavailing on summary judgment because the record must be construed in the light most favorable to the nonmovant.  At most, Ryals' denial merely creates an issue of fact to be resolved at trial.

[37]    Also telling in this regard are two additional facts.  First, while several other individual defendants submitted Rule 56 affidavits touting their personal record in hiring parents of private school children, no such passage appears in Ryals' Affidavit, which was presumably drafted by the same counsel who prepared the other individual defendants' declarations.  In her deposition, Ryals testified

-27-

Summary Judgment as to these positions.

> 2.    *Application for ARFI Positions.*

The record also shows that Bond applied for three reading positions in April 2003, including two reading coach positions and one reading coordinator job.  All three positions were created pursuant to an Alabama Reading First Initiative ("ARFI") grant awarded to the Board in 2003.  (Philen Aff., ¶ 3; Hines Aff., ¶ 3.)  Defendants Jennifer Philen and Elaine Hines, both of whom are administrative employees of the Board, conducted the interviews, including the interview of Bond, and ultimately made hiring recommendations for those positions.  (Philen Aff., ¶ 4; Hines Aff., ¶ 4.)  To satisfy the minimum qualification criteria for the ARFI jobs, a candidate was required to have already received specific training in both the Alabama Reading Initiative ("ARI," an earlier incarnation of the ARFI grant) and Direct Instruction.  (Hines Aff., ¶¶ 6, 8 & Exh. A.)  Because Bond had not completed that training, she was deemed unqualified for the ARFI positions.  (*Id.*, ¶ 10; Bond Dep., at 69-70.)  In her deposition and brief, plaintiff has candidly admitted that she was not qualified for those vacancies.[38]

Of course, a necessary element of a *prima facie* case of discriminatory failure to hire is that a plaintiff is qualified for the position.  Defendants having proffered evidence that Bond did not meet the

---

that she was "not sure" whether any of the persons she had recommended for hire in her six years as principal of Monroeville Elementary had "any private school affiliation."  (Ryals Dep., at 35-36.)  Thus, it does not appear that Ryals ever hired a private school parent.  Second, the employment application that Bond submitted specifically inquired where her children attended school.  Plaintiff's summary judgment filings ask rhetorically why this question would appear if defendants did not intend to use that information in the hiring process.  (Plaintiff's Brief, at 8, 9.)  Yet defendants' briefs studiously ignore that issue, making no attempt to justify the inclusion of that question on the application form.

[38]    In her deposition, Bond testified as follows about the ARFI slots:

"A:    ... They wanted to know if I had attended the ARI workshop.  At that time, I had not. Well, I had attended like a day of the workshop at that time.  But I had not had the full week of training that was needed for that position.
"Q:    So you weren't qualified?
"A:    ***Right, I wasn't qualified.***"

(Plaintiff Dep., at 107 (emphasis added).)  Similarly, plaintiff's brief allows that she "may not have been objectively qualified for" the ARFI jobs.  (Plaintiff Brief, at 4-5.)

minimum threshold qualifications for the reading coordinator and reading coach positions, and plaintiff having admitted as much, Bond cannot establish a *prima facie* case as to these positions. As such, any § 1983 claim predicated on defendants' failure to hire Bond as a reading coordinator or reading coach in April 2003 is not viable, as a matter of law, and defendants are entitled to summary judgment on these claims.[39] Because the reading coordinator/coach claims are the only ones implicating defendants Hines and Philen, the Court hereby **dismisses** plaintiff's claims against them.[40]

>    3.    *Application for Monroeville Middle School Positions in 2002.*

The next category of positions consists of two third-grade teaching jobs at Monroeville Middle School in 2002. Defendant Darenell Payne, the principal of Monroeville Middle, made the hiring recommendations for those jobs. (Payne Aff., ¶ 8.) The record shows that Bond applied for those positions, but it is unclear whether Payne or anyone else from Monroeville Middle interviewed her in connection with that application. Payne testified that he does not remember interviewing Bond for those positions. (*Id.*)

It is evident from the record that Bond can make a *prima facie* case of discrimination with respect to these third-grade positions. It is equally evident, however, that defendants have proffered a legitimate nondiscriminatory reason for not selecting her, namely, Payne's assessment that one

---

[39]    The Court recognizes that plaintiff seeks to blame defendants for her own lack of qualification. Specifically, Bond suggests that defendants wrongfully declined to allow her to participate in the training program at her own expense because she was not a Board employee. (Plaintiff's Brief, at 4-5.) But the uncontroverted evidence is that only Board employees were permitted to participate in ARI training sessions. (Philen Dep., at 85-87.) Further, there is not a scintilla of evidence from which a factfinder could conclude that either (a) parents of public school children were allowed to attend such training sessions if they were not Board employees, or (b) the Board's policies and practices for ARI training sessions were in any way designed or intended to exclude either Bond personally or parents of private school children generally. As such, plaintiff's suggestion that it was unfair for the Board to restrict ARI training sessions to current employees is wholly unavailing for purposes of her § 1983 claims.

[40]    The only time that Hines and Philen were ever involved in the hiring process for a Board employment position was for these ARFI jobs. (Philen Aff., ¶ 10; Hines Aff., ¶ 11.) Neither Hines nor Philen was involved in or aware of other instances in which Bond was denied employment in Monroe County. (Philen Aff., ¶ 10; Hines Aff., ¶ 11.)

successful applicant "had an outgoing and pleasing personality" and that the other "came highly recommended" from another school.  (Payne Aff., ¶ 8.)

The Court finds no genuine issue of fact as to whether Payne's stated reasons for his decision not to recommend Bond for the 2002 positions was pretextual.  The reason is simple.  The uncontroverted evidence is that as of 2002, Payne had no knowledge that plaintiff's children attended private school.  (Payne Aff., ¶ 9.)  Far from presenting evidence that Payne had such awareness, Bond concedes that she did not discuss with Payne where her children attended school.  (Bond Dep., at 73-74.)  Indeed, Bond admits that she does not know whether Payne was aware that her children were enrolled in private school.  (*Id.* at 82-83.)  Because the undisputed evidence is that Payne lacked knowledge of how Bond had exercised her rights of educational choice, it is not possible for Payne to have discriminated against her on that basis in rejecting her application.  Common sense dictates that a defendant cannot take adverse action against a plaintiff based on a protected characteristic that defendant does not know plaintiff has.  That being the situation here, defendants are entitled to summary judgment on the 2002 Monroeville Middle positions.

>    **4.    *Application for Frisco City Elementary Position in 2000.***

In 2000, Bond was one of five applicants for a kindergarten teaching vacancy at Frisco City Elementary School.  (Hicks Aff., ¶ 2.)[41]  Defendant William Royster, who was the principal of Frisco City Elementary from 1983 until his retirement in May 2003, made the hiring recommendation for that position.  (Royster Aff., ¶¶ 3, 6.)  Royster denied Bond's application and recommended that another applicant, Sonya Pugh, be hired instead.  (*Id.*, ¶ 6.)  The record reflects that Royster never formally interviewed Bond for the kindergarten job.  (Bond Aff., ¶ 11.)[42]

_____

[41]    There is some evidence that plaintiff applied for another, unspecified position at Frisco City Elementary at an unspecified time.  (Bond Dep., at 86-87, 91-92, 102-03.)  Absent evidence as to what this position was or when Bond applied for it, this hiring decision cannot be evaluated here.

[42]    This affidavit testimony appears to contradict Bond's deposition transcript, wherein she stated in reference to Royster, "I went in his office and we had a good interview, the first year I moved into Monroeville."  (Bond Dep., at 86.)  Because this inconsistency between Bond's affidavit and her deposition testimony is not material, the Court need not resolve it for purposes of the instant Rule 56 inquiry.

Bond undoubtedly satisfies the *prima facie* elements for that position, inasmuch as she had protected class status, she applied for and was qualified for the position, and the position remained open after her rejection or was filled by a person without her protected class status.   Defendants have also met their burden of articulating a legitimate reason for denying Bond's application, to-wit: Royster's assessment that Pugh "would be a good fit" because she had substituted "in the school system before."  (Royster Aff., ¶ 6.)

But plaintiff had substituted in the school system for the 2001-2002 year, including specifically substituting at Frisco City Elementary.  (Bond Dep., at 86; Royster Aff., ¶ 7; Defendants' Exh. 22.) Although this evidence would ordinarily be sufficient to create an inference of pretext (inasmuch as Royster testified that Bond was passed over because the successful applicant had substitution experience in Monroe County, which Bond did too), Royster could not possibly have discriminated against Bond for enrolling her children in private school.  Much like defendant Payne, the undisputed evidence is that Royster did not even know that Bond had children, much less that she sent those children to private school, when he denied her application for the kindergarten teaching position in 2000.  (Royster Aff., ¶ 9.)  Plaintiff testified that she did not tell Royster that she was sending her children to private school, and that Royster never expressed unwillingness to hire someone whose children went to private school.  (Bond Dep., at 91.)  Obviously, Royster could not have rejected Bond's application because she enrolled her children in private school if he did not know she was doing so.  Thus, just as in the Payne situation discussed *supra*, defendants are entitled to summary judgment on plaintiff's claim that she was unlawfully denied employment at Frisco City Elementary in 2000. Because this hiring decision is the only one implicating defendant Royster, and because no claim arising from that decision can survive Rule 56 scrutiny, plaintiff's claims against Royster are **dismissed**.

> 5.      *Excel Positions in 2002 and 2003.*

In 2002 and 2003, plaintiff applied for three positions at Excel School, including a kindergarten position in 2002, a fifth-grade job in June 2003, and a kindergarten slot in June 2003.  The hiring recommendations for all three of these posts were made by defendant John Ross, the principal of Excel. (Ross Aff., ¶¶ 2, 4, 6.)  Bond was personally known to Ross, inasmuch as she served as a substitute

teacher at Excel "numerous times" during the 2000-2002 time frame.  (Bond Dep., at 104.)  Ross interviewed Bond on multiple occasions for these jobs.  (Ross Aff., ¶ 6.)  In contrast to defendants Payne and Royster, Ross does not deny knowledge at the time of these interviews that Bond's children attended private school.

Plaintiff has candidly acknowledged in her deposition that she is "not really qualified to teach fifth grade."  (Bond Dep., at 164.)  This admission precludes her from making a *prima facie* showing as to the fifth-grade position.  Defendants' Motion for Summary Judgment is due to be **granted** as to that position.

With respect to the two kindergarten positions, defendants do not and cannot reasonably contest plaintiff's ability to make a *prima facie* showing.  She plainly had protected class status (by virtue of sending her children to private school), met the minimum qualifications for these positions, applied for these positions, and was rejected, after which the positions were left open or were filled by persons who did not send their children to private schools.

According to defendants, Ross rejected Bond's application for these kindergarten jobs because the successful applicants "had very strong recommendations, performed well in interviews, had not been late for interviews and had seemed to take the process more seriously than Mrs. Bond, who was not respectful of [Ross's] time during the interview process."  (Ross Aff., ¶ 6.)  Ross avers that Bond was late for one interview and canceled another "at the last minute."  (*Id.*; Ross Dep., at 39.)  Ross's suggestion that Bond failed to take the process seriously stems solely from the fact that she was late to an interview.  (Ross Dep., at 39-40.)  Such evidence satisfies the defendants' burden of showing a legitimate nondiscriminatory reason for the challenged personnel decisions at Excel.

Nonetheless, there is ample evidence from which a reasonable factfinder could conclude that Ross's stated reasons for denying Bond's applications lack credence.  The successful applicants may have had strong recommendations, but the record shows that Bond did too.  As for punctuality, Bond denies ever being late to an interview at Excel; to the contrary, she explains that Ross required her to wait in line for at least one interview, such that it was Ross (and not Bond) who was disrespectful of the other's time.  (Bond Aff., ¶ 11.)  Bond further denies having canceled an interview at the last minute,

-32-

and states that she canceled one interview out of respect for Ross's time because the position was an aide job for which she was overqualified.  (*Id.*)  Thus, a reasonable factfinder could conclude that Bond demonstrably took the hiring process seriously, that she was never late for an interview, that she did not cancel an interview at the last minute, and that her references were excellent.[43]  As for how well or poorly Bond interviewed, such a subjective issue is obviously a matter of perception that is not readily amenable to resolution on summary judgment; however, a reasonable factfinder could conclude that a seasoned job hunter like Bond (with well over a decade of teaching experience and a track record of being hired promptly in multiple Alabama public school systems) was a competent and capable interview subject.  All of these facts, coupled with Ross's knowledge that Bond's children attended private school, raise a sufficient issue of pretext to enable Bond to withstand summary judgment as to the Excel kindergarten teacher jobs.

### 6.     *Frisco City High Position in May 2004.*

The record reflects that plaintiff applied for a second-grade teaching post at Frisco City High School in May 2004.  (Hicks Aff., ¶ 2.)  Bond was not hired for this position.  The record does not

---

[43]        A reasonable factfinder could also conclude that plaintiff's objective job qualifications far outstripped those of Sandy Lowery, the successful applicant for both kindergarten positions.  (Ross Aff., ¶ 4; Ross Dep., at 36-37.)  As of 2002, Bond's objective qualifications included four post-secondary degrees (including two masters' degrees and an Ed.S.), 17 years of elementary school teaching experience (much of it at the kindergarten level), and extensive experience substituting at Excel.  By contrast, Lowery had a bachelor's degree, a year and a half of teaching experience in Montgomery County (all at the first and second grade levels), and no experience at Excel.  This striking disparity furnishes additional persuasive evidence of pretext.  *See, e.g., Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000) ("evidence showing an employer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting the plaintiff was pretextual").  Of course, such disparities in qualifications are not sufficient, in and of themselves, to prove pretext unless they are so great that they "jump off the page and slap you in the face."  *Id.* Although it strains credulity to think that a reasonable factfinder could deem Lowery more qualified than Bond, based on these objective qualifications, no such finding is necessary here.  Bond has shown other evidence of pretext and is not relying simply on the difference in qualifications; therefore, the "slap you in the face" test is inapplicable.  *See Vessels v. Atlanta Independent School System*, 408 F.3d 763, 772 (11th Cir. 2005) ("where the qualifications disparity is not the sole basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext").

identify the principal of Frisco City High as of May 2004; therefore, it is unclear who actually decided to deny Bond's application.

With respect to the *McDonnell Douglas* factors, Bond plainly satisfies the *prima facie* elements for that position, inasmuch as she had protected class status, she applied for and was qualified for the position, and the position remained open after her rejection or was filled by a person without her protected class status. Defendants' briefs neither identify whom they hired to fill this position nor explain their reasons for this decision. Instead, defendants merely point out that "[n]one of the defendants interviewed Ms. Bond for this position." (Defendants' Brief, at 12.)[44]  As such, the Court finds that defendants failed to meet their burden of production, which obligates them to come forward with a legitimate nondiscriminatory reason for a challenged hiring decision. Absent any record basis for concluding that defendants had a nondiscriminatory basis for rejecting Bond's application for the Frisco City High School second-grade position in 2004, defendants' Motion for Summary Judgment must be **denied** as to that claim.[45]

> 7.   *Monroeville Middle Position in May 2004.*

Finally, in May 2004, plaintiff applied for a third-grade teaching job at Monroeville Middle

─────────────────────────

[44]   This statement may be true; however, it does not necessarily foreclose the possibility of any defendants being held liable for that decision. If the principal of Frisco City High decided to reject Bond's application, and if that principal is a final policymaker for the Board, then the Board may be liable, notwithstanding plaintiff's failure to name the Frisco City High principal as a party defendant.

[45]   Defendants' burden of articulating legitimate, nondiscriminatory reasons for their employment decision is one of production only. An employer "need not persuade the court that it was actually motivated by the proffered reasons." *Israel v. Sonic-Montgomery FLM, Inc.*, 231 F. Supp.2d 1156, 1160 (M.D. Ala. 2002) (quoting *Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000)). Nonetheless, it is incumbent on defendants to produce evidence of a legitimate, nondiscriminatory reason for rejecting Bond's Frisco City High application. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) (to raise genuine issue of fact, defendant "must clearly set forth, through the introduction of admissible evidence, the reasons for" the challenged decision); *IMPACT v. Firestone*, 893 F.2d 1189, 1193 (11th Cir. 1990) (reversing lower court's finding that defendants satisfied burden of production where "defendants offered no evidence explaining any employment decision"). Their failure to do so precludes an award of summary judgment on that claim.

School, where defendant Payne remained as principal.  (Hicks Aff., ¶ 2; Payne Aff., ¶ 3.)  Payne interviewed Bond for this position, but decided not to recommend her because she "did not completely answer the interview questions and she was vague in her answers."  (Payne Aff., ¶ 6.)  Instead, Payne recommended an individual named Heather Kinsey because he had known her for years (presumably because Kinsey's mother is a teacher at Monroeville Middle), she answered the questions directly, he was otherwise impressed with her interview, and she was recommended highly by another teacher at Monroeville Middle.  (*Id.*, ¶ 7.)[46]

On these facts, there can be no serious question that the first two elements of the *McDonnell Douglas* test are satisfied.  Plaintiff was undoubtedly in a protected class (by virtue of sending her children to private school), was qualified for the third-grade teaching job, and applied for it, and the position was ultimately filled by a person who was not sending her children to private school. However, defendants have countered this evidence with a showing that Payne felt that Bond did not interview well and that the successful applicant interviewed better than Bond did.

Defendants having shown a legitimate nondiscriminatory reason for rejecting Bond's application, the burden shifts to plaintiff to establish pretext.  Plaintiff's evidence on this front is twofold.[47]  First, she submits a recording and transcript of the interview as evidence that she did not

---

[46]    As he did with the 2002 position, Payne protests that he did not know that Bond's children attended private school.  The difference is that in April 2004 Bond sent Payne and all other Monroe County principals a copy of a new job application in which she responded truthfully to the question asking where her children attend school.  (Bond Aff., ¶ 14 & Exh. A.)  Payne admits that he had access to and reviewed that application prior to making his hiring recommendation.  (Payne Dep., at 28-29.)  That fact raises an inference that Payne did possess such knowledge as of the May 2004 personnel decision.

[47]    Plaintiff also attempts to posit direct evidence of discriminatory intent.  In particular, plaintiff argues that an unexplained, cryptic "NA" notation in Payne's interview notes near Bond's name might actually read "MA," which could be a coded reference to Monroe Academy.  (Plaintiff's Brief, at 9.)  This argument fails.  The referenced notation is unambiguously an "NA," not an "MA." (Defendants' Exh. 10-A.)  Moreover, plaintiff's counsel's questions to Payne during the latter's deposition make plain that counsel understood the referenced symbol as "NA," not "MA."  (Payne Dep., at 22-23.)  The Court will not indulge rank speculation that "NA" might have some nebulous, enigmatic link to Monroe Academy or to the allegations in this case.

-35-

respond to Payne's questions in a vague or incomplete manner.[48]  In the opinion of the Court, reasonable minds could differ as to the proper characterization of plaintiff's performance during that interview, so there is room to doubt Payne's stated reason for rejecting Bond's application.  Second, plaintiff offers evidence of the gross disparity in qualifications separating Kinsey and Bond.  Kinsey's application reflected that she had no prior teaching experience and that her only work experience had been in the day care field.  (Plaintiff's Exh. 23.)  Her application further indicated that Kinsey had just earned her bachelor's degree in May 2004, that she did not hold an Alabama teacher's certificate at the time she submitted her application, and that she had not taken the National Teacher Examination. (*Id.*)  By contrast, Bond had two masters' degrees and an Ed.S. in addition to her bachelor's degree, as well as 18.8 years of elementary school teaching experience, an "AA" Alabama teacher's certificate, and had taken the National Teacher Examination.  The gaping chasm separating the qualifications of Bond from those of Kinsey amounts to compelling evidence of pretext.[49]  When this evidence is coupled with evidence of Bond's interview performance, the Court finds sufficient facts from which a reasonable factfinder could conclude that defendants' stated reasons for rejecting Bond's application are not worthy of credence.

        Plaintiff having thus satisfied her burden of showing pretext, defendants' Motion for Summary

---

        [48]      Bond surreptitiously recorded her interview with Payne without notice or permission. (Bond Dep., at 65, 73, 77.)  Plaintiff has offered both the transcript and a CD-R of that interview recording as part of the record.  (Plaintiff's Exh. 31.)  Defendants have not objected or moved to strike either of these items; therefore, the Court will not *sua sponte* investigate their admissibility, but will consider these materials for summary judgment purposes.

        [49]      In reaching this conclusion, the Court is keenly aware of defendants' argument that having the most education, experience, certifications and other "paper" qualifications does not automatically render an applicant the most qualified, because intangibles such as interview performance matter.  (Defendants' Brief, at 24; Reply Brief, at 13-14.)  The point here is that Bond's paper qualifications dwarf the neophyte Kinsey's.  Is it possible that Payne could reasonably have determined Kinsey's interview performance to be sufficiently masterful, mesmerizing, and magnificent to outweigh her relatively meager objective credentials?  Certainly.  But it is also possible that the gap in those qualifications is so vast that no reasonable decisionmaker could have recommended Kinsey over Payne in the absence of unlawful considerations.  It is the function of a jury, and not this Court on summary judgment, to choose between these competing inferences.

Judgment as to the 2004 position at Monroeville Middle is due to be, and the same hereby is, **denied**.

### 8.      *Defendants' Mixed-Motive Defense.*

In their reply brief, defendants urge the Court to conclude that they would have reached the same hiring decisions anyway, even in the absence of consideration of Bond's exercise of her First Amendment right to free association.  (Reply Brief, at 5-6.)  Defendants' representation that "the overwhelming evidence establishes that plaintiff Bond would not have been recommended ... and/or hired ... despite the fact her children were enrolled at Monroe Academy" (*id.* at 6) overlooks substantial evidence from which a reasonable finder of fact could conclude otherwise.  Summary judgment is inappropriate on this ground.

### D.      **The Board's "Policy or Custom" Defense.**

Defendants argue that even if plaintiff has made an adequate showing of pretext, the Board is entitled to summary judgment because she cannot show that the Board had a policy or custom that deprived her of her constitutional rights.  Section 1983 liability cannot be imposed against a school board on the basis of *respondeat superior*, but rather requires a showing of a "municipal 'policy' or 'custom' causing the deprivation of federal rights."  *Sauls v. Pierce County School Dist.*, 399 F.3d 1279, 1287 (11th Cir. 2005); *see also Dixon v. Burke County, Ga.*, 303 F.3d 1271, 1276 (11th Cir. 2002) ("It is well-settled that a local government body may only be liable under § 1983 if action pursuant to official policy caused a constitutional tort.").  Under the "policy" requirement, "a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Id.* (citation omitted).  Meanwhile, the "custom" threshold is crossed when a practice that has not been formally approved by an appropriate decisionmaker "is so widespread as to have the force of law."  *Id.*

### 1.      *School Principals are Final Policymakers as to Bond.*

In identifying the relevant policymakers for the challenged decisions, the Court derives guidance from the Eleventh Circuit's articulation of the appropriate standard in *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004).  Pursuant to the custom or policy requirement, a municipality "may be held liable for acts or policies of individuals to whom it delegated final

decisionmaking authority in a particular area." *Id.* at 1291; *see also Denno v. School Bd. of Volusia County, Fla.*, 218 F.3d 1267, 1276 (11ᵗʰ Cir. 2000) ("In order for the actions of a government official to be deemed representative of the municipality, the acting official must be imbued with final policymaking authority."). "[I]n assessing whether a governmental decision maker is a final policy maker, we look to whether there is an actual 'opportunity' for 'meaningful' review." *Holloman*, 370 F.3d at 1292. In so declaring, the *Holloman* panel cited with approval authority indicating that if a higher official has the power to overrule a decision but as a practical matter never does so, then that lower decisionmaker may be deemed a "final policymaker" for purposes of municipal liability. *Id.* In any event, "the determination of whether an official has final policymaking authority is a question of state law to be decided by the court." *Floyd v. Waiters*, 133 F.3d 786, 794 (11ᵗʰ Cir. 1998).

The Board insists that school principals are not final policymakers in hiring decisions. In support of its position, the Board points to Alabama Code § 16-8-23, which provides in relevant part that county boards of education "shall appoint, upon the written recommendation of the county superintendent, all principals, teachers, clerical and professional assistants authorized by the board." *Id.* The Board also relies on undisputed evidence of its hiring practices, pursuant to which (a) a school principal interviews all candidates and recommends a single candidate to fill the position, (b) defendant Mixon (the Superintendent) reviews the application of the candidate chosen by the principal, and recommends his or her hire to the Board, and (c) the Board reviews the recommended candidate's application, approves the Superintendent's recommendation, and hires the successful applicant. Based on this practice, the Board maintains that it (and not its principals or Mixon) is the final policymaking authority with regard to the hiring of personnel.

The Court cannot agree with the Board's analysis, which focuses on the hiring of successful applicants, not the rejection of unsuccessful applicants. The final policymaking authorities may not be identical in those two scenarios. Such is the case here. The uncontroverted evidence is that school principals are the only Monroe County officials who ever review the applications of unsuccessful applicants. Once a principal decides not to recommend a candidate, neither the superintendent nor the Board ever revisits that rejection decision, re-interviews the candidate, or resuscitates her candidacy for

-38-

any reason.  In *Holloman* terms, once an applicant is rejected by a principal, that decision is final.  She has no recourse to the Board for meaningful review.[50]  Even if the Board were technically empowered to overrule those rejection decisions, defendants have come forward with no evidence that the Board has ever reviewed a rejection decision, much less overturned it.  As such, the *Holloman* standard leads the Court inexorably to the conclusion that the individual defendants were, in fact, final policymakers for the Board in rejecting Bond's 21 attempts to secure employment.  Each time those individual defendants denied her job applications, that decision was final, unreviewed and effectively unreviewable by the Board.  On the record presented, the Court concurs with plaintiff's characterization that "the principals in Monroe County are the highest repositories of authority for excluding people from the applicant pool."  (Plaintiff Brief, at 25.)

The individual defendants may or may not have had final policymaking authority to hire, but they unquestionably were vested with final policymaking authority to reject.  It is the latter decision that animates this litigation.  Because the individual defendants were final policymakers as to each of their decisions to reject Bond's applications for employment, their decisions are binding on the Board and can give rise to § 1983 liability for the Board, as a matter of law.[51]  Accordingly, defendants' Motion

---

[50]       Perhaps the most potent evidence on this point is Bond's testimony that when she complained to Mixon about Ryals rejecting her application, his advice was for her to find a principal who liked her.  Mixon's words make clear that principals' rejection decisions are final and that if a principal did not like Bond, then she was simply out of luck in finding a job at that principal's school.

[51]       The Board's reasoning is ultimately self-defeating, even if its arguments on final policymaking authority were accepted.  The Board starts with the black-letter principle that it cannot be liable on a *respondeat superior* theory.  As such, the Board can only be liable under § 1983 for (a) decisions of the Board itself, and (b) decisions by final policymakers on behalf of the Board.  In arguing vehemently that the individual defendants are not final policymakers, the Board tries to evade liability under (b) by declaring that the Board itself was the decisionmaker, thus leaping headlong into (a).  *See, e.g.*, Defendants' Brief, at 18 ("the board itself, and not its employees (including the superintendent), is the final policy making authority with regard to the hiring or discharge of personnel").  Thus, even if the Court were to agree with the Board that the individual defendants are not final policymakers, a necessary corollary of that conclusion would be that the Board itself was the decisonmaker who rejected plaintiff's employment applications 21 times.  The Court is aware of no authority – and defendants cite none – holding that a municipality may evade liability under § 1983 for its own actions.

-39-

for Summary Judgment is **denied** insofar as it rests on a defense of no official policy or custom.

### 2.    *Sufficient Evidence of Supervisory Awareness.*

Even if the principals were not deemed final policymakers for their decisions to deny plaintiff's employment applications, and even if those decisions are not the Board's, there is an alternate theory under which the Board may be held responsible. In particular, municipal liability may be imposed vicariously under § 1983 where "a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130, 108 S.Ct. 915, 928, 99 L.Ed.2d 107 (1988). If in fact principals in the Monroe County system were systematically excluding from employment prospective teachers whose students attend private school, then a reasonable inference exists that the Board could not have been ignorant of such developments. In this regard, the comments attributed to defendant Black (a Board member) that hiring a teacher in Monroe County is a "package deal" support the inference that Black and the Board were aware that principals would not hire teachers whose children went to private schools. This is particularly true given the vitriolic community outcry (as reflected in contemporary published reports) against public school teachers whose own children were enrolled in private schools. The defendant Board members have not – and likely cannot – credibly claim ignorance of this issue and its importance to their constituents. In light of these facts, the record supports a sufficient inference of the Board's awareness that principals were rejecting employment applications of would-be teachers with children in private schools for such practice to constitute a "custom or usage" supporting Board liability under § 1983.

### E.    *Plaintiff's Claims Against the Individual Defendants.*

The individual defendants posit three defenses to the claims brought against them. First, they contend that the claims against the individual defendants in their official capacities are redundant of those against the Board, and therefore should be dismissed. Second, they assert that they are entitled to qualified immunity. Third, several individual defendants argue that they should be dismissed because plaintiff failed to plead the claims against them with the requisite particularity. Each of these arguments will be considered in turn.

1.    *Official Capacity Claims.*

The individual defendants have been sued both in their individual and their official capacities. As to the latter, defendants argue that such claims should be dismissed because they are the functional equivalent of plaintiff's other claims against the Board.

Defendants are correct.  It is well established that "[o]fficial-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165, 87 L.Ed.2d 114, 105 S.Ct. 3099 (1985) (quoting *Monell v. New York Dep't of Social Services*, 436 U.S. 658, 690 n.55 (1978)).  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Graham*, 473 U.S. at 166.  As Bond's claims against the individual defendants in their official capacities appear wholly redundant of her claims against the Board, those official-capacity claims should be dismissed.

This conclusion is reinforced by Bond's failure to address those official-capacity claims in her summary judgment brief, or to respond to defendants' redundancy argument.[52]  The Eleventh Circuit has held that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment."  *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (party's failure to brief and argue issue before district court is ground for declaring it abandoned); *McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (noting that a claim

---

[52]    To the extent that plaintiff would shift to the Court the burden of formulating and presenting her summary judgment arguments on the official-capacity claims, such a gambit is impermissible.  "[T]he court is under no duty to exercise imagination and conjure what a plaintiff might have alleged, but did not, and do counsel's work for him or her."  *Pinto v. Universidad De Puerto Rico*, 895 F.2d 18, 19 (1st Cir. 1990); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment"); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000) ("[i]t is not for the court to manufacture arguments on Plaintiff's behalf" in response to a summary judgment motion).

may be considered abandoned when it is included in complaint, but plaintiff fails to argue it to district court).[53]  Such holdings are grounded on the well-worn principle that "the onus is upon the parties to formulate arguments." *Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir. 1997).

Defendants' Motion for Summary Judgment is **granted** as to the official-capacity claims against the individual defendants, inasmuch as those claims are duplicative of plaintiff's corresponding claims against the Board and have been abandoned by Bond, in any event.

### 2.     *The Qualified Immunity Defense.*

With respect to the individual-capacity claims, the individual defendants invoke the defense of qualified immunity.  Where, as here, a government official is sued in his individual capacity for money damages based on alleged civil rights violations, he may posit an affirmative defense of qualified immunity.  *See Swint v. City of Wadley, Ala.*, 51 F.3d 988, 994 (11th Cir. 1995).  The Supreme Court has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L. Ed.2d 396 (1982).  As such, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

"[I]n order to receive qualified immunity, the public actor must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).  This burden rests with the

---

[53]     These principles are not unique to the Eleventh Circuit. *See generally Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 892 (Fed. Cir. 1999) (discussing "unremarkable proposition that assertions made in the pleadings ..., but not made in opposition to a motion for summary judgment, need not be considered by the district court or the appellate court in ruling on the motion"); *Laborers' Int'l Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions."); *Ali v. Brown*, 998 F. Supp. 917, 924 (N.D. Ill. 1998) (where complaint alleged discrimination on basis of several protected characteristics, but summary judgment brief pursued only Title VII race claim, plaintiff's failure to support remaining claims with argument or authority waived them).

public official, and failure to satisfy it negates the qualified immunity defense.  *See Holloman*, 370 F.3d at 1264 (explaining that if defendants cannot show that they were engaged in a discretionary function, they are ineligible for qualified immunity).  In assessing whether an official was engaged in a discretionary function, "[w]e ask whether the government employee was (a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."  *Id.* at 1265.  There can be no serious question that, in considering and rejecting Bond's applications for employment in various Board teaching positions, the individual defendants were pursuing job-related goals through means within their power to utilize.  The complained-of acts were well within the scope of their discretionary authority.

"Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity."  *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).  To satisfy this burden, courts examine whether the defendant's conduct "violated a clearly established constitutional right" of which a "reasonable government official would have been aware."  *Chesser*, 248 F.3d at 1122; *see also Bennett v. Hendrix*, --- F.3d ----, 2005 WL 2174056, *2 (11th Cir. Sept. 9, 2005) (official performing discretionary function is barred from qualified immunity if evidence in light most favorable to plaintiff shows that official's conduct violated a clearly established constitutional right).[54]  "A constitutional right is clearly established if controlling precedent has recognized the right in a concrete and factually defined context."  *Chesser*, 248 F.3d at 1122 (citation omitted); *see also Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1305 (11th Cir. 2005) ("A right is clearly established if, in light

---

[54]    The Eleventh Circuit recently explained the standard as follows:  "A government official acting within his discretionary authority is eligible for qualified immunity when the facts '[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right' and when 'the right was clearly established.'"  *Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1299 (11th Cir. 2005).  Thus, questions of violation of a constitutional right and the clearly established nature of that right are of central importance to the analysis; however, the *Akins* court misspoke when it stated that an official is eligible for qualified immunity if the evidence shows that the officer violated a clearly established constitutional right.  An officer is plainly <u>ineligible</u> for qualified immunity in those circumstances.  *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

-43-

of already-existing law, the unlawfulness of the conduct is apparent.").

As set forth in Section IV.B., *supra*, the Eleventh Circuit recognized more than 20 years ago that parents have a "constitutional right to control the education of their children."  *Stough*, 744 F.2d at 1480.  To be sure, *Stough* counsels that parents' right may yield to a school board's interest in operating and administering its school depending on the outcome of a *Pickering* balancing test.  In the wake of *Stough*, however, it should be readily apparent to any school official in the Eleventh Circuit that interfering with a parent's right to send her children to private school, with no countervailing school interest, is unlawful.[55]  Here, defendants have never identified any legitimate administrative or operational reason for discriminating against a job applicant whose children attend private school; therefore, there is no *Pickering* test to be performed.  Simply put, defendants have failed to articulate any basis under which the *Stough* reasoning could have left any doubt in the mind of a reasonable school official that refusing to hire Bond because she sends her children to private school is a constitutional violation.  Nothing more is needed for plaintiff to demonstrate that the constitutional right at issue here was clearly established.[56]

---

[55]    The outcome might be different if, for example, the individual defendants raised legitimate justifications for a patronage policy that the *Stough* court never considered.  In that event, there might well be uncertainty as to how the *Stough*-mandated *Pickering* balancing test would be resolved, and therefore a legitimate question as to whether defendants' activities actually did unlawfully infringe on plaintiff's constitutional rights.  But that is not the case here.  Defendants have never offered any justification for why it might be appropriate for the Board to exclude prospective teachers whose children were enrolled in private schools.  As this action is presently postured, then, the *Stough* rationale inescapably shows the clearly established nature of the constitutional rights at issue.

[56]    This conclusion is bolstered by other appellate holdings that the constitutional rights on which Bond's claims rest are, in fact, clearly established.  For example, the Sixth Circuit has rejected a qualified immunity defense in like circumstances, reasoning that "[b]ecause it has been clearly established that one's involvement in constitutionally protected activity cannot be the sole basis for denying public employment, any reasonable official would know that denying employment based on a parent's constitutional right to direct his child's education is a violation of the law."  *Barrett*, 388 F.3d at 973 (rejecting qualified immunity defense for public school official who conditioned plaintiff's employment on transferring his child from private to public school); *see also Barrow*, 332 F.3d at 846-49 (reversing grant of qualified immunity to school officials who refused to promote plaintiff because she sent her children to private school, explaining that public school employees' right to select private

Rather than using a *Stough*-type analysis, defendants' invocation of the qualified immunity defense adopts a different approach. Defendants reason that their hiring decisions were "subjective judgments," that Bond's right to send her children to private school did not vest in her an entitlement to be hired ahead of better or equally qualified applicants, and that Bond's lawsuit effectively seeks a ruling that "interviewing officials are legally compelled to recommend and/or hire a person they deemed to be unqualified or simply not the best candidate for the position." (Reply Brief, at 9; Defendants' Brief, at 26.) The premise of this argument is flawed. It assumes that defendants' evidence must be credited and plaintiff's evidence must be rejected, with all inferences taken in favor of defendants.[57] But qualified immunity is assessed from the facts taken in the light most favorable to a plaintiff, not to defendants. *See Akins*, 420 F.3d at 1299. For the reasons set forth *supra*, a reasonable factfinder could conclude that defendants rejected Bond's employment applications not because they believed she was less qualified than the successful applicants but because she exercised her right to send her children to private school, all in violation of Bond's clearly established constitutional rights. That fact forecloses the individual defendants' ability to secure dismissal of their individual-capacity claims on qualified immunity grounds.[58]

---

school education for their children was clearly established); *see generally Cook v. Gwinnett County School Dist.*, 414 F.3d 1313, 1320 (11th Cir. 2005) ("the law is clearly established that public employees have a First Amendment right to engage in associative activity without retaliation").

[57]     Under defendants' reasoning, it would have been unnecessary even to reach the qualified immunity issue to rule on the Rule 56 Motion. Indeed, defendants' qualified immunity argument presumes that there is no substantial evidence that defendants denied Bond employment because of her children's school affiliation. But if that were the case, the Court's analysis never would have had to proceed past Section IV.C., *supra*, and the qualified immunity argument would have been moot. Defendants' argument is unavailing where, as here, there is substantial evidence that defendants' refusal to hire Bond was motivated by her decision to educate her children in private schools.

[58]     In reaching this conclusion, the Court recognizes the strand of authority holding that the presence of mixed motives for a challenged employment decision does not necessarily preclude qualified immunity. *See, e.g., Foy v. Holston*, 94 F.3d 1528, 1535 (11th Cir. 1996) ("Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity."). However, the *Foy* rationale has

3.      The "Insufficient Particularity" Defense.

A final argument articulated by defendants is that the Complaint lacked sufficient particularity in identifying the specific wrongful acts of individual defendants Royster, Payne, Ross and Hines for purposes of plaintiff's § 1983 claims.  Defendants do not explain why they waited until filing their summary judgment brief, a full year after this action commenced, to identify a purported pleading defect about which they must have known since the inception of this lawsuit.  Defendants do not explain why they neither filed a motion for definite statement nor voiced this "insufficient particularity" concern in their responsive pleading.  Defendants do not suggest they were prejudiced in any way by virtue of the alleged pleading inadequacies.  Most significantly, defendants do not identify a single authority holding that individual defendants may be awarded summary judgment on "insufficient particularity" grounds in circumstances such as these.  Defendants' bid for summary judgment on this basis is **denied**.[59]

_____

been confined to circumstances where "the record indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations."  *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1296 (11th Cir.2000); *Bogle v. McClure*, 332 F.3d 1347, 1355-56 (11th Cir. 2003) (rejecting qualified immunity defense where record did not undisputably indicate that defendants were motivated, at least in part, by objectively valid reasons in challenged personnel actions); *compare Chesser*, 248 F.3d at 1125 (granting qualified immunity where decision to discharge plaintiff was indisputably due, at least in part, to insubordination).  The record does not indisputably establish the presence of lawful motives here; therefore, the individual defendants cannot reach qualified immunity via *Foy*.

[59]      If defendants truly believed that the Complaint failed to offer sufficient detail about the individual defendants' alleged wrongdoing to sustain § 1983 claims, then they should have filed motions to dismiss or motions for more definite statement long ago.  Had they done so, and had their arguments been deemed meritorious, plaintiff would have been afforded an opportunity to file an amended complaint satisfying the requisite particularity threshold.  *See Rubin v. O'Koren*, 621 F.2d 114, 117 (5th Cir. 1980) (authorizing § 1983 plaintiff to attempt to remedy insufficiently detailed complaint via amendment, and reversing lower court's dismissal on that basis).  Defendants cannot be rewarded for their stealth approach to the alleged pleading defect issue.  If summary judgment were granted on that basis, Bond would be unable to replead her claims against these defendants with greater particularity because the deadline for filing amended pleadings has long since passed.  Simply put, defendants could and should have raised any concerns they had with the adequacy of the pleadings at the inception of this litigation, when plaintiff was still able to remedy any alleged defect.  Having waited until now, without good cause, defendants have waived their right to object to the particularity of the Complaint's allegations against the individual defendants.

-46-

Even if defendants had properly invoked the particularity issue, the Court disagrees with the substance of this objection.  The Complaint plainly alleges that defendants Royster, Payne, Ross and Hines had "recommended other less qualified applicants and rejected the plaintiff as a candidate for employment."  (Complaint, ¶ 14.)  It further alleges that such conduct "violated the Plaintiff's federally protected rights of freedom of association and of family privacy" because her decision to enroll her children in private school "was a substantial motivating factor in the decision of the Defendants, jointly and individually, to deny her employment."  (*Id.*, ¶¶ 18-19.) Defendants have not explained why these allegations fail to satisfy court-imposed particularity requirements on pleadings alleging § 1983 causes of action against individual defendants.

## V.      Conclusion.

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.       Defendants' Motion for Summary Judgment (doc. 31) is **granted in part, and denied in part**.

2.       More specifically, that Motion is **granted** with respect to the following issues: (a) plaintiff's applications for reading coordinator and two reading coach positions in April 2003; (b) plaintiff's applications for two third-grade teaching positions at Monroeville Middle School in 2002; (c) plaintiff's application for a kindergarten teaching position at Frisco City Elementary School in 2000; (d) plaintiff's application for a fifth-grade teaching position at Excel School in June 2003; and (e) all of plaintiff's claims against the individual defendants in their official capacities.  The Court finds that there are no genuine issues of material fact with respect to any of these specific enumerated claims, and therefore **dismisses** those claims **with prejudice**.  In all other respects, the Motion for Summary Judgment is **denied**.

3.       Pursuant to item 2, *supra*, no surviving claims have any bearing on defendants William Royster, Jennifer Philen, and Marion Hines.  Accordingly, all claims against those three individual defendants are **dismissed with prejudice**, and the Clerk's Office is directed to terminate those individuals as defendants on the docket sheet of this action.

-47-

4.      Defendants' Motion to Strike (doc. 50) is **granted in part, and denied in part**.  The Motion is **granted** with respect to references in Evelyn Bond's affidavit to an alleged conversation with Jeanette Adams, and those references are **stricken**.  The Motion is **denied** in all other respects.

5.      For cause shown, plaintiff's Motion to Substitute (doc. 48) a corrected brief is **granted**, and the proposed brief appended to that Motion is hereby **substituted** for the previous iteration of that brief (doc. 44), which the Court has previously stricken in any event for noncompliance with Local Rule 7.1(b).

6.      Plaintiff's summary judgment Exhibits 8 - 12 and 15 - 17 (doc. 45) are **stricken** for failure to take reasonable precautionary measures to protect sensitive private information of third parties.  The Clerk's Office is directed to permanently **delete** those Exhibits from the electronic court file on the CM/ECF system.  Plaintiff's counsel is **ordered** to submit redacted versions of those same exhibits, accompanied by an appropriate Notice of Filing, on or before **October 14, 2005**.

7.      To facilitate review of the parties' extensive summary judgment submittals, the Court directed the parties to submit bound, tabbed hard copies of their summary judgment filings to chambers.  The parties complied; however, plaintiff's hard-copy submission includes several original exhibits, including what appear to be originals of the Affidavit of Fredia Tatum and the Affidavit of Fred Hunker.  The parties' courtesy copy submissions do not constitute the official record in the case, and will not be maintained by the Clerk of Court.  If plaintiff's counsel wishes to retrieve these originals, he should make arrangements with the undersigned's chambers to do so on or before **October 31, 2005**.  Otherwise, such documents will be discarded in the ordinary course.

8.      Plaintiff's Request for Oral Argument (doc. 42) is **denied**.

DONE and ORDERED this 6th day of October, 2005.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE